676 So.2d 1206 (1995)
Larry ROE, et al.
v.
MOBILE COUNTY APPOINTMENT BOARD, et al.
Larry ROE, et al.
v.
STATE OF ALABAMA, By and Through its Attorney General, Jeff SESSIONS, et al.
1940461.
Supreme Court of Alabama.
March 14, 1995.
Specially Concurring Opinion Issued March 15, 1995.
Further Dissenting Opinion Issued March 22, 1995.
Rehearing Application Stricken March 31, 1995.
*1207 Bruce J. McKee of Hare, Wynn, Newell & Newton, Birmingham; Joe R. Whatley, Jr., and Samuel H. Heldman of Cooper, Mitch, Crawford, Kuykendall & Whatley; and Jack Drake of Drake & Pierce, Tuscaloosa, for "The Davis Class".
Joseph S. Johnston and J. Michael Druhan, Jr., of Johnston, Wilkins & Druhan, Mobile; Algert S. Agricola, Jr., of Wallace, Jordan, Ratliff, Byers & Brandt, L.L.C., Montgomery; and Albert L. Jordan, B. Glenn Murdock and Michael L. Jackson of Wallace, Jordan, Ratliff, Byers & Brandt, L.L.C., Birmingham, for Larry Roe, Perry O. Hooper, Sr., and James D. Martin.
Jeff Sessions, Attorney General, and William H. Pryor, Jr., Deputy Attorney General, for the State of Alabama, the Secretary of State, Probate Judges, Sheriffs, and Circuit Clerks.
Specially Concurring Opinion Issued by Justice Cook March 15, 1995.
Further Dissenting Opinion Issued by Justice Maddox March 22, 1995.
PER CURIAM.
The United States Court of Appeals for the Eleventh Circuit asks: Does Alabama law permit or require some, but not all, absentee ballots which are sealed in envelopes signed by the voter, but not notarized or witnessed by two witnesses as required by § 17-10-7, Ala.Code 1975, to be counted to determine the results of the general election held November 8, 1994?[1] The Eleventh Circuit states the question:
"Whether absentee ballots that, on the accompanying affidavit envelope, fail to have two witnesses and lack proper notarization (for example, ballot envelopes that have only a signature or only one witness, or on which the voter and the notary have signed the ballot, but the notary fails to fill in the `title of official') meet the requirements of Alabama Law, specifically Alabama Code Section 17-10-7, to be legal ballots due to be counted in the November 8, 1994 general election."
Roe v. Alabama, 43 F.3d 574, 583 (11th Cir. 1995).
On November 8, 1994, Alabama held a general election. When the voting was complete, the preliminary unofficial results showed the race for Chief Justice of the *1208 Supreme Court to be extremely close, as was that for State Treasurer. Shortly after election day, it was discovered that, within the State of Alabama, ballots not in strict compliance with the statute had been counted in some counties and had not been counted in others. Because of the closeness of the tally, the treatment of some 2,000 uncounted absentee ballots by Alabama election officials became an issue. No one knows what the result of the election will be when these ballots are counted. It is known that ballots not legally distinguishable from these uncounted ballots have been counted.

Litigation History
The litigation involving the November 8th election began on November 11, 1994, when the Republican candidate for Chief Justice of the Supreme Court, Perry O. Hooper, Sr., and the Republican candidate for State Treasurer, James D. Martin, sought an ex parte temporary restraining order ("TRO") from Shelby County Circuit Court to secure all election records for an anticipated election contest. They named as defendants individuals who represented a class of persons composed of all Alabama election officials.[2] The circuit judge ordered the election officials to maintain the possession and security of all election materials, including absentee ballots and related affidavits. This order was served or sent by facsimile to voting officials throughout the state.
On November 16, 1994, voters Michael Lewis Odom and John W. Davis, each of whom had voted by absentee ballot, filed suit in the circuit court of Montgomery County, Alabama,[3] seeking a ruling that Davis's absentee ballot, which is one among some 2,000 statewide absentee ballots sealed in envelopes signed by voters but not also notarized or signed by two witnesses, should be counted.[4] The plaintiffs sought a temporary restraining order that would enjoin Secretary of State James Bennett from certifying the results of the general election without counting the ballots that substantially complied with the absentee ballot form, pursuant to Wells v. Ellis, 551 So.2d 382 (Ala.1989), and Williams v. Lide 628 So.2d 531 (Ala.1993).[5]
Judge Joseph D. Phelps convened a hearing on the TRO at approximately 6:00 p.m. and took testimony. He then issued a temporary restraining order from the bench giving the court an opportunity to hear, and the parties an opportunity to present, at a full hearing, evidence and law on the issue of whether or not there were absentee ballots wrongfully excluded. The next morning Judge Phelps issued a written order enjoining the Secretary of State from certifying and counting the election results until a full hearing could be held in this cause or until further order of this Court.
That afternoon, a hearing was held before Judge Eugene W. Reese.[6] Present at the hearing was Algert S. Agricola, Jr., representing the Republican Party, which sought and was granted leave to intervene. Subsequently, Judge Reese held that absentee ballots should be counted if they met the "substantial compliance" standard articulated in Wells v. Ellis, 551 So.2d 382 (Ala.1989), and Williams v. Lide, 628 So.2d 531 (Ala.1993). His order stated:
"In accordance with Williams v. Lide, those persons counting the absentee ballots for each county shall count each ballot which contains: (1) the place of residence of the person casting the ballots; (2) the reason for the vote or voting by absentee *1209 ballots; and, (3) the signature of the voter. Absentee ballots may not be excluded from being counted because of a lack of notarization or a lack of witnesses."
". . . .
"Further, Defendant [Secretary of State James] Bennett is enjoined from certifying and/or compiling vote totals in all races until the recounting of the absentee ballots has been effected and until he has received all of the amended recertifications reflecting the recounting of the absentee ballots. At the time Defendant Bennett receives all of the amended recertifications, then Defendant Bennett shall certify the election results in all races."
This order was filed with the circuit clerk on November 17, 1994.
As the record reflects, the Republican Party had already obtained a TRO in Shelby County Circuit Court for election officials to maintain the possession and security of all election materials, including absentee ballots and related affidavits. The question of whether absentee ballots that met the Williams v. Lide test for substantial compliance should be counted was being litigated in the Montgomery County Circuit Court and was ripe for state appellate review. However, no appeal was taken from Judge Reese's order. Although Mr. Agricola gave oral notice of appeal in open court, he never filed a notice of appeal. Under Alabama law, an appeal will lie if filed within 14 days after an order granting a preliminary injunction. Had the Republican Party appealed from the order of the Circuit Court of Montgomery County issued in November, 1994, the entire controversy involving the November general election would have been resolved long ago. The people of Alabama would have known the outcome of the election, and the losing candidates, had they chosen to do so, could have contested the elections in the state legislature.
Counsel for the Republican Party, Algert S. Agricola, Jr., for "strategic reasons," decided that it was in the best interests of his clients, the Republican candidates, Hooper and Martin, to seek relief in a federal forum. Those candidates, along with Larry Roe (a voter who voted for these Republican candidates), filed a complaint in the U.S. District Court for the Southern District of Alabama in Mobile. The plaintiffs were represented by Albert L. Jordan, Joseph S. Johnston, and J. Michael Druhan. Mr. Agricola subsequently joined these lawyers as counsel for the Republican candidates. The defendants were the Mobile County Appointing Board, Mobile County Probate Judge Lionel W. Noonan, the Wilcox County Appointing Board, and Wilcox County Probate Judge Jerry Boggan.[7] The complaint sought relief pursuant to 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202; and the All Writs Act, 28 U.S.C. § 1651. United States District Judge Alex F. Howard held an ex parte hearing and, on November 18, 1994, issued an ex parte TRO that enjoined "All Persons Who Are Designated by Alabama State Law as the Appointing Boards in Each of Alabama's Counties" to refrain from taking any action to alter any ballots or other election materials. This same relief had previously been sought by the same parties and ordered by the state circuit court in Shelby County.
On November 18, 1994, Republican voter Ralph E. Bradford, Sr., an African-American, brought suit in the U.S. District Court for the Northern District of Alabama under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, seeking to enjoin the counting of the absentee ballots that the Circuit Court of Montgomery County had ordered to be counted.[8] Bradford's suit claimed that the state court order amounted to a change within the scope of the preclearance requirement of Section 5 of the Voting Rights Act and that the alleged change had not been precleared. Bradford was also represented by Algert S. Agricola, Jr., who represented the Republican Party in the Circuit Court of Montgomery County, and by Albert L. Jordan *1210 and B. Glenn Murdock, Agricola's co-counsel in the U.S. District Court, Southern District of Alabama. Michael Lewis Odom and John W. Davis, the plaintiffs in the case before the Circuit Court of Montgomery County, intervened in the Bradford suit.
Judge Robert B. Propst, U.S. District Judge, Northern District, issued an order the same day Bradford filed suit that temporarily restrained the counting of the absentee ballots. Later that day, a three-judge panel, consisting of U.S. District Judges Robert B. Propst and James H. Hancock and U.S. Court of Appeals Judge Emment R. Cox, reaffirmed the TRO and directed Secretary of State Bennett and the county appointing boards to stop counting the absentee ballots.
On November 22, a hearing was convened on Bradford's motion for a preliminary injunction before the three-judge panel. At this hearing, the defendants (state election officials) presented a letter from the United States Department of Justice preclearing the November 16, 1994, order of the Circuit Court of Montgomery County, under the Voting Rights Act. This letter stated:
"Under the proposed change, absentee ballots would be accepted in all cases where the absentee form contains, at minimum, the voter's (1) place of residence, (2) reasons for voting absentee, and (3) signature. It appears most accurate to characterize the instant change as the implementation of a uniform standard for counting absentee ballots in the state. It is clear from all accounts that the actual practice and standards for accepting absentee ballots has varied considerably among Alabama's 67 counties, and the substantial compliance rule, or some variation of it, appears to have been the rule in a number of Alabama counties for a considerable period. Voters in such counties have come to rely on an absence of any strict requirement that all information sought in the state code absentee voter form be provided. In each such county, we note, a change to strict compliance would itself constitute a voting change with a potential for discrimination, and would itself require Section 5 preclearance prior to any implementation by the state (i.e., prior to rejection of any such ballots) notwithstanding the code language. Perkins v. Matthews, 400 U.S. 379 [91 S.Ct. 431, 27 L.Ed.2d 476] (1971). We also note that the announcement by the Alabama Supreme Court of the standard in Williams v. Lide appears to have prompted some reliance by voters on that standard for this election."
Letter of John K. Tanner, Acting Chief, Voting Section, Civil Rights Division, U.S. Department of Justice, to Marc Givhan, Deputy Attorney General, State of Alabama. The three-judge panel then requested clarification of this letter, posing these questions:
"Was it the intent of the Attorney General of the United States, in the letter dated November 22, 1994 to Marc Givhan, Deputy Attorney General, State of Alabama, not to interpose objection(s) to the following:
"1. The order of the Circuit Court of Montgomery County, Alabama in Michael Lewis Odom, et al. v. Jim Bennett, et al., CV 9402434, which directed that voting officials count absentee ballot votes neither witnessed nor notarized as apparently required by § 17-10-7 of the Code of Alabama 1975?
"2. The application of said Montgomery County, Alabama Circuit Court order to absentee ballot votes cast in the November 8, general election?"
A letter of clarification was received that afternoon. It confirmed that the U.S. Department of Justice understood Judge Reese's order to require that "absentee ballots cannot be rejected on the basis of the absence of two witnesses or notarization" and that the Justice Department precleared the order on that basis. The Justice Department's letter stated:
"The November 16, 1994 order in Odom was included in your submission, and the change was precleared on that basis. Under the precleared change, absentee ballots cannot be rejected on the basis of the absence of two witnesses or notarization, or for the omission of other information called for in the form set forth at Section 17-10-7, so long as such ballots do contain the information required by the court in Odom." *1211 Letter of John K. Tanner, Acting Chief, Voting Section, Civil Rights Division, U.S. Department of Justice, to Marc Givhan, Deputy Attorney General, State of Alabama.
At the beginning of the hearing, Bradford amended his complaint to add claims under Section 2 of the Voting Rights Act and 42 U.S.C. § 1983. He alleged that the counting of the absentee ballots in question would violate his federal constitutional rights. This is the exact relief that candidates Hooper and Martin sought in the United States District Court for the Southern District. At the conclusion of the hearing, Judge Robert B. Propst[9] stated his view that the decision of the Eleventh U.S. Circuit Court of Appeals in Curry v. Baker, 802 F.2d 1302 (11th Cir. 1986), barred the relief under Section 2 of the Voting Rights Act, that Bradford sought by his amended complaint in the federal courts. Judge Propst observed:
"But Curry v. Baker, I think, could be appropriately cited with regard to your amended complaint. Certainly as it relates to the due process claims or the equal protection claims because Curry v. Baker is much more binding on this court than the three-judge panel decision in Henderson v. Graddick. And I think that one reason that I certainly wouldn't be able to just this afternoon jump up and start enjoining something based on the amended complaint would be because of Curry v. Baker.

"Now, I don't think that there was a Section 2 claim invoting rights Section 2 in Curry v. Baker, there may have been. If there was, Curry v. Baker probably tends to dispose of it just like it disposed of the equal protection claim and, you know, and I am just not too inclined without some briefing to go down that same Curry v. Baker path because what happened in Curry v. Baker that also followed a three-judge panel Section 5 claim and I am just not too inclined to follow that same path."
On November 25, 1994, the three-judge panel dissolved its temporary restraining order and refused to issue a preliminary injunction under Section 5 of the Voting Rights Act. The three-judge panel dismissed the claims under Section 5 of the Voting Rights Act and refused to entertain the constitutional claims allegedly made under Section 2 of the Voting Rights Act. Judge Propst explained:
"As this judge made plain at the hearing on November 22, the decision of this court to dissolve its own restraining order had no effect on, nor did it conflict with, the ruling of any other court, state or federal. The three-judge panel in this case sat as a trial court, not an appellate court. To this judge's knowledge the action in this case was the only pending case which addressed § 5 of the Voting Rights Act. That was the only federal law addressed by this court. The attorneys, of course, were well aware of the foregoing. Their clients should have had no misunderstanding."
Bradford, footnote 1, page 2.
On the morning of November 23, 1994, U.S. District Judge Alex T. Howard placed a telephone call to Secretary of State Bennett, who was not a party to this case at that time. During the call, Judge Howard instructed Bennett that he had entered an order to preserve evidence, including absentee ballots, for a possible contest. Judge Howard told Bennett that counting the absentee ballots in question would be a violation of the restraining order, which he had previously issued in this case, because the ballot envelopes would have to be opened in order to count the ballots. He also threatened Secretary of State Bennett with contempt sanctions if the ballots were counted. At 11:30 a.m. on the same day, Judge Howard issued a written order sua sponte, amending his prior TRO. In this new TRO, Judge Howard ordered Secretary of State Bennett to refrain from certifying any election results in the elections of Hooper and Martin, notwithstanding any order of the Montgomery County Circuit Court.
On November 28, 1994, the plaintiffs amended their complaint in the United States District Court, Southern Division, to *1212 allege claims against Secretary of State Bennett in his official capacity and to add all circuit clerks, probate judges, and sheriffs as class defendants, as well as to add John Davis, a plaintiff in the case before Judge Reese, as a defendant and the representative of a class of absentee voters who submitted ballots that were signed by the voter, but lacked either notarization or the signatures of two witnesses in the November election (the "Davis class"). Further, the plaintiffs added claims that the counting of the ballots would violate their rights under Section 2 of the Voting Rights Act and 42 U.S.C. § 1983, the exact claim they had made in the U.S. District Court for the Northern District. They sought a declaratory judgment by the U.S. District Court declaring the order of the Montgomery County Circuit Court issued by Judge Reese to be null and void. They also sought a preliminary and a permanent injunction requiring the defendants to preserve all materials relating to the election. Attorneys Johnston, Druhan, and B. Glenn Murdock, all of whom represented parties in the U.S. District Court for the Northern Division, signed the complaint. Algert S. Agricola, Jr., counsel for the Republican Party before the Circuit Court of Montgomery County, filed a notice of his appearance as additional counsel for plaintiffs. Agricola also represented plaintiffs in the Northern District Bradford litigation.
On November 29, 1994, Secretary of State Bennett filed a motion to dissolve or amend the ex parte order or for a stay pending appeal. The basis of Bennett's motion was that federal Judge Howard had ordered him not to count absentee ballots, while Judge Reese had ordered him to count those absentee ballots that met the substantial compliance test of Williams v. Lide.
The question of whether state law required state election officials to count absentee ballots substantially in compliance with the requirements of Alabama's election statutes was pending in the state courts of Alabama, and an order of a circuit court directly addressing this issue was outstanding. Under Alabama law, an expedited appeal could have been taken from that order. No appeal was taken.
On December 5, 1994, Judge Howard held a hearing not only on the preliminary injunction, but also on the plaintiffs' newly added claims (alleging violations of Section 2 of the Voting Rights Act, due process, and equal protection)[10], which collaterally attacked the order of the state circuit court. That afternoon, Judge Howard issued a preliminary injunction, which held that the plaintiffs had a constitutional right for the ballots not in strict compliance with the statute not to be counted. His order effectively disfranchised John Davis and other members of the "Davis class," none of whom was alleged to be an unqualified voter. There was no evidence that any uncounted vote was tainted in any way. There was no evidence of voter fraud. There was no evidence that any irregularities in any uncounted ballot affected the sanctity of the ballots in any way. There was no evidence that the integrity of the election would be affected by the counting of these ballots. Even so, Judge Howard ordered Secretary of State Bennett to certify the election result without the absentee ballots being counted. Federal Judge Howard's order is in direct conflict with the previously issued order of the Circuit Court of Montgomery County.
The defendants sought a stay or modification from Judge Howard. He denied these motions. The defendants appealed to the U.S. Court of Appeals, Eleventh Circuit. By December 6th, a motion for a stay had been filed with the appellate court. On that date, despite the pendency of the motion for a stay in the Eleventh Circuit, Judge Howard again called Secretary of State Bennett and stated that he had issued a preliminary injunction. Secretary of State Bennett filed a motion on December 7th, seeking to prevent any party from filing a motion for contempt against him. On December 8, plaintiffs filed a petition for rule nisi seeking contempt sanctions against Secretary of State Bennett. On the morning of December 9th, Judge Howard denied Bennett's motion for a stay and issued a rule nisi giving the Secretary of State three hours in which to "show cause why he should *1213 not be held in civil contempt of this Court for failure to abide by this Court's preliminary injunction of December 5, 1994." Shortly before the three hours were up, the Eleventh Circuit stayed all efforts by Judge Howard to enforce contempt proceedings against the Alabama Secretary of State.
On January 4, 1995, a three-judge panel of the Eleventh Circuit, consisting of Chief Judge Tjoflat, Judge Edmondson, and Judge Birch, issued its order. Chief Judge Tjoflat and Judge Birch upheld the preliminary injunction in this case and certified the question under our certification rule.
Judge Edmondson dissented, stating:
"I know of no other case involving disputed ballots in which a federal court has intervened in a state election where the plaintiff failed to show, in fact, either:
"1. that plaintiff had `lost' the election but would have won the election if lawful votes only had been counted (that is, the alleged constitutional error changed the election result); or
"2. that it was impossible ever to know that his opponent (the apparent winner) had truly won the election because of the nature of the voting irregularities (that is, the alleged constitutional error placed in everlasting doubt what was the true result of the election).
"Nothing is known in this case about whether the alleged illegalities have affected or will affect the outcome of the pertinent elections. Yet today we plow into Alabama's election process and uphold a preliminary injunction that, in effect, overrules a pre-existing state court order which had directed that the contested votes be counted. And, instead, the federal courts (basically, stopping short the state election processes) order that the contested votes be not counted at all. This high level of federal activity seems unnecessary and, therefore improper. So, I conclude that the district court abused its discretion."
Thus, two members of the three-judge panel affirmed Judge Howard's preliminary injunction that invalidates a judgment issued by the Circuit Court of Montgomery County and interrupts the resolution of this election dispute by the state courts of Alabama. The panel takes this action, although no appeal from Judge Reese's order was taken to the Alabama Supreme Court, although counsel for the parties before both the state and federal courts were the same, and although attorney Agricola announced that he would appeal Judge Reese's order. He later told Judge Reese that, for strategic reasons, the decision was made to proceed to the federal courts instead of pursuing an appeal from Judge Reese's order.

Federalism and Federal Precedent
The bar to federal jurisdiction under the facts of this case, as established by Curry v. Baker, 802 F.2d 1302 (11th Cir.1986), and abundant additional federal authority cited below, is clear. Additionally, principles of federalism, comity, and the Full Faith and Credit Clause of the Constitution mandate that federal courts permit state court litigation to proceed to a resolution of state election disputes, and should not intervene to stop that state process.
Judge Howard entertained the Republican candidates' Section 2 Voting Rights Act claim and federal constitutional due process and equal protection claims after the three-judge panel in Bradford refused to do so. Res judicata should have foreclosed a relitigation in a second federal court. Judge Howard, in entertaining these claims, also refused to follow the decision of the Eleventh Circuit in Curry v. Baker, 802 F.2d 1302 (11th Cir. 1986), which prevents a federal court from interfering with the state courts' resolution of a dispute such as that involved in this case. As the Eleventh Circuit recognized and emphasized in Curry v. Baker, the U.S. Constitution and 42 U.S.C. § 1983 do not provide federal courts with the authority to intervene in state elections, except in rare matters. "Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." Curry, 802 F.2d at 1314.
Curry v. Baker involved a primary runoff election for the Democratic candidate for Governor of Alabama in which there was massive illegal cross-over voting. Following the primary, the State Democratic Committee *1214 certified the candidate (William Baxley) receiving the majority of the legal votes over the candidate (Charles Graddick) receiving the majority of votes. Graddick and his supporters brought suit in the U.S. District Court alleging violations of due process and equal protection. The U.S. district judge ordered the Democratic Party to conduct a new primary and enjoined the disqualification of Graddick. A three-judge panel of the Eleventh Circuit reversed that judgment and remanded the case to the district court, stating:
"`The functional structure embodied in the Constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by § 1983' operate to restrict federal relief in the state election context. [Citations omitted.] Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election. Griffin v. Burns, 570 F.2d 1065, 1078 (1st Cir.1978). Only in extraordinary circumstances will a challenge to a state election rise to the level of constitutional deprivation. In Gamza [v. Aguirre, 619 F.2d 449], reh'g denied, 625 F.2d 1016 (5th Cir.1980), our predecessor court
"`recognize[d] a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a [constitutional violation].'
"619 F.2d at 453.
"... In evaluating claims arising from `episodic events,' courts have followed the general rule that `if the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots.' [Citations omitted.] As with much of the law of substantive due process, there are no bright lines distinguishing `patent and fundamental unfairness' from `garden variety' election disputes....
"Gamza [v. Aguirre, 619 F.2d 449 (5th Cir.1980)], posed this issue in clear terms. Gamza and four of his supporters alleged that election officials had negligently and unlawfully performed the vote count, thereby costing him the election. The Fifth Circuit found that plaintiff failed to state a constitutional deprivation under § 1983.
"`In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters or motivated by a desire to subvert the right of the voters to choose their ... representative, we cannot conclude that the error constituted a denial of equal protection of the laws.'
"619 F.2d at 454."
Curry, 802 F.2d at 1314-15.
The three-judge panel in Curry criticized the United States District Court for becoming "engulfed in the morass of election details," which were held properly left to state election officials and state courts, and held:
"There is no evidence that plaintiffs lacked an adequate remedy in the state courts. Alabama law provides an adequate procedure for addressing election irregularities.... A federally protected right `is implicated where the entire election processincluding as part thereof the state's administrative and judicial corrective processfails on its face to afford fundamental fairness.' That is not the case here. State process was available but it was not used.
". . . .
"Even if plaintiffs' claimed deprivation had risen to a constitutional level, ... the court below erred in failing to give sufficient weight to the substantial state interests served in this case...."
Id. at 1316-17. Judge Godbold noted in Curry: "Even in cases involving overt racial *1215 discrimination this court has considered the voiding of a state election to be `drastic, if not staggering ... and therefore a form of relief to be guardedly exercised.' Bell v. Southwell, 376 F.2d 659, 662 (5th Cir.1967)." Id. at 1315, n 7.
The Curry court noted that Alabama law provides an adequate procedure for addressing election irregularities, citing the election contest provisions found in § 17-15-1 et seq., Ala.Code 1975. A state process was available, but it was not used. The same state procedure is still available in Alabama at this time. Once the election results of the November 8 election are certified, the losing candidate has a statutory right to contest the election. The Curry Court stated that federal courts should not become involved in state election disputes
"`in the absence of aggravating factors such as denying the right of citizens to vote for reasons of race, or fraudulent interference with a free election by stuffing of the ballot box, or any other unlawful conduct which interferes with the individual's right to vote.'"
Id. at 1315-16 (quoting Pettengill v. Putnam County R-1 School District, Unionville, Mo., 472 F.2d 121, 122 (8th Cir.1973)).
Other federal circuits have consistently reached the conclusion that the states should be primarily responsible for regulating their own elections. In Griffin v. Burns, 570 F.2d 1065 (1st Cir.1978), the First Circuit recognized that the Constitution confers the power to control the disposition of contests over elections to state and local offices. Griffin v. Burns, supra, at 1077 (quoting Hubbard v. Ammerman, 465 F.2d 1169, 1176 (5th Cir. 1972), cert. denied, 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973) (wherein the Court stated that the U.S. Constitution confers upon the states the "power to control the disposition of contests over elections to ... state and local offices" (citation omitted))). However, the federal court in Griffin ruled that due process required federal action because 1) the federal court was the only practical forum for redress, 2) there was no standard state procedure for handling the claim, and 3) the state court did not confront the question.
In Powell v. Power, 436 F.2d 84 (2d Cir. 1970), six voters against whom the statute of limitations had run on a state claim sought federal relief under the Voting Rights Act and 42 U.S.C. § 1983. At issue was a close congressional primary election where, by mistake, a number of persons not members of the party holding the primary were allowed to vote. The Second Circuit rejected the § 1983 claim on the grounds that the due process clause and art. I, § 2, of the United States Constitution offer no guarantee against errors in the administration of an election. Reasoning that the federal courts are not equipped or empowered to supervise the administration of a local election, the Second Circuit ventured that if every election irregularity involved a federal violation, the court would "be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law." Powell, 436 F.2d at 86.
The Fourth Circuit, when presented with a suit by three unsuccessful candidates for public office, upheld dismissal in favor of all defendants. The Fourth Circuit noted:
"Our constitution does not contemplate that the federal judiciary routinely will pass judgment on particular elections for federal, state or local office. The conduct of elections is instead a matter committed primarily to the control of states, and legislative bodies are traditionally the final judges of their own membership. The legitimacy of democratic politics would be compromised if the results of elections were regularly to be rehashed in federal court. Federal courts, of course, have actively guarded the electoral process from class-based discrimination and restrictive state election laws.... In this essentially factual dispute, we defer to those primarily responsible for elections and we refuse to authorize yet another avenue for those disgruntled with the political process to keep the contest alive in the courtroom."
Hutchinson v. Miller, 797 F.2d 1279, 1280 (4th Cir.1986), cert. denied, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The *1216 plaintiffs in Hutchinson alleged irregularities in the general election and sought damages under 42 U.S.C. § 1983 and 18 U.S.C. § 1964 (the Racketeer Influenced and Corrupt Organizations Act). The Fourth Circuit stated that it must refrain from considering the particulars of disputed elections, especially in a suit for damages, because:
"To do otherwise would be to intrude on the role of the states and the Congress, to raise the possibility of inconsistent judgments concerning elections, to erode the finality of results, to give candidates incentives to bypass the procedures already established, to involve federal courts in the details of state-run elections, and to constitute the jury as well as the electorate as an arbiter of political outcomes. These costs, we believe, would come with very little benefit to the rights fundamentally at issue herethe rights of voters to fair exercise of their franchise."
Hutchinson, 797 F.2d at 1285.
In Welch v. McKenzie, 765 F.2d 1311 (5th Cir.1985), motion to withdraw judgment denied, 777 F.2d 191 (5th Cir.1985), the Fifth Circuit ruled that a federal court should not intervene in a state election dispute where it was alleged that votes were improperly counted. Characterizing the dispute as a "garden variety," the Fifth Circuit ruled that it did not rise to the level of a constitutional deprivation. Citing Gamza v. Aguirre, 619 F.2d 449 (5th Cir.1980), as controlling, the Fifth Circuit held that the claim was not actionable in federal court because our federal system contemplates that states will be primarily responsible for regulating their own elections. Welch, 765 F.2d at 1317. Gamza concerned a claim brought under 42 U.S.C. § 1983 by a candidate, who lost a school board election in Texas, and his supporters. The Fifth Circuit declined federal involvement in the case, stating:
"We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause."
Gamza, 619 F.2d at 453. The Fifth Circuit noted:
"The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss. [Citations omitted.] Section 1983 did not create a delictual action for the torts of state officials, see Baker v. McCollan, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695-96, 61 L.Ed.2d 433 (1979), and it did not authorize federal courts to be state election monitors. For these reasons we have concluded that the denial of a nominee's right to a position on a ballot by an episodic election irregularity in a county primary election does not deprive his supporters of a federal constitutional right. [Citations omitted.]"
Id. at 453-54.
The Seventh Circuit in Hennings v. Grafton, 523 F.2d 861 (7th Cir.1975), refused to act in a case involving the malfunction of voting machines in a county election. The Court distinguished the voting machine problem in that case from willful conduct, which undermines the organic processes by which candidates are elected. The Court reasoned that only the latter type of claim could give rise to a constitutional claim under 42 U.S.C. § 1983.
In Pettengill v. Putnam County R-1 School District, Unionville, Mo., 472 F.2d 121 (8th Cir.1973), the plaintiff claimed that the right to vote had been diluted by the defendant's improper counting of ballots. The Eighth Circuit determined that it was not the federal court's role to "oversee the administrative details of a local election." Pettengill, 472 F.2d at 122. The Court found no constitutional grounds for intervention "in the absence of aggravating factors such as denying the right of citizens to vote for reasons *1217 of race, or fraudulent interference with a free election by stuffing of the ballot box, or any other unlawful conduct which interferes with the individual's right to vote." Id. (citations omitted).
In support of their claims of constitutional deprivation, the plaintiffs rely upon Griffin v. Burns, supra, and Duncan v. Poythress, 657 F.2d 691 (5th Cir.1981). These cases are clearly distinguishable from the present case, however, since, in both cases, state action had disfranchised a substantial portion of the electorate, whereas the plaintiffs in this case are complaining that a portion of the electorate has been improperly enfranchised by the state court order. In Griffin and Duncan, once the voters were disfranchised, no other legal remedies existed for them to pursue under state law. Here, however, adequate post-election procedures exist under Alabama law. There is no constitutional deprivation because state remedies exist that adequately protect any interest the plaintiffs may have.
The plaintiffs have a fair remedy under state law that protects their interests, while not automatically disfranchising an entire class of voters, in the election contest procedure. § 17-15-1 through § 17-15-63, Ala. Code 1975. This procedure has been held to be adequate and fair by the Eleventh Circuit in Curry v. Baker, supra at 1316-17. The ruling of Curry v. Baker is supported by the Eleventh Circuit's recent holding in McKinney v. Pate, 20 F.3d 1550 (11th Cir.1994), cert. denied, McKinney v. Osceola County Bd. of Comm'rs, ___ U.S. ___, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), in which the Court of Appeals emphasized that if state law provides a means by which an action in question may be challenged, then one does not have a procedural due process claim in the federal courts.
By issuing and upholding an injunction in this case, the federal courts have violated the basic tenets of federalism and the long-standing rule against interference by federal courts in state election matters. Such action violates the "Rooker-Feldman doctrine." Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine was explained by the Eleventh Circuit in Liedel v. Juvenile Court of Madison County, Ala., 891 F.2d 1542, 1545 (11th Cir.1990) (quoting from District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483-84 n. 16, 103 S.Ct. 1303, 1315-16 n. 16, 75 L.Ed.2d 206 (1983)):
"Lower federal courts possess no power whatever to sit in direct review of state court decisions. If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's denial [of a claim] in a judicial proceeding ... then the district court is in essence being called on to review the state court decision. This the district court may not do."
The Republican plaintiffs seek to evade the Rooker-Feldman doctrine on the grounds that it is not they, but their party, that intervened in Odom v. Bennett. This argument has no merit. The interests of these Republican candidates are identical to the interests of the Republican Party, and to permit them to evade Rooker-Feldman on this basis would destroy it. In addition to having the same lawyers, the plaintiffs have the closest possible relationship to the Republican Party. They are executive officers of the Republican Party.
In addition to the above-discussed principles of federalism, the federal courts have developed a doctrine of abstention. The abstention doctrine, like recusal, involves perhaps a more subjective analysis by federal courts, but, in this case, it appears that the federal courts should have abstained from exercising jurisdiction. Railroad Comm'n v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).[11]

*1218 Alabama Law

When all of the litigation in this dispute is over, and the single legal issue has been decided, and the results of the election of November 8 are certified, an aggrieved party has the right under § 17-15-1 et seq., Ala.Code 1975, and § 115 of the Alabama Constitution to file a contest of the election in the legislature. No court, state or federal, has jurisdiction to hear evidence in an election contest for a statewide election, such as is involved here. A losing candidate, when the votes are certified, has a right to contest the election in the state legislature under the procedures established by § 17-15-1 et seq., of the Code.
Our certification procedures assume that any federal court certifying a question to this Court has jurisdiction of the underlying cause and that the answer to the question is determinative of the cause. The procedure providing for certified questions was adopted to further the return to federalism in this country. Those who drafted the rule, a group including several present members of this Court, never imagined that the federal courts would assume jurisdiction of a case previously decided by a state court, invalidate the order of the state court, ignoring federal precedent in doing so, and then have another federal court, on an appeal from a preliminary injunctionwhere the parties had no notice that the hearing would be on the merits and which is, at best, entered on an incomplete recordask this Court to answer a question of state law, stating at the same time that the answer of this Court will not be considered in that federal appellate court, no matter what the answer is, in determining the case.
Rule 18(a) of the Alabama Rules of Appellate Procedure provides:
"(a) When Certified. When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer."
Here, the opinion that accompanies the question indicates that the answer supplied by this Court will not be determinative. We are asked to answer the question in the context of an election, the outcome of which is unknown to anybody. As Judge Edmondson observed in his dissent, this should be reason enough to put off intervention by the federal courts, at least until candidates Hooper and Martin can show that they have been injured by the Alabama practice. Judge Edmondson stated:
"At a time when we do not know whether the contested votes, in fact, will make any difference at all in the outcome of the elections, it is hard for me to say that I am now facing the kind of extraordinary circumstancespatent and fundamental unfairness tied to concrete harmthat will amount to a constitutional deprivation and that will justify immediate significant federal interference in the election processes of a state."
43 F.3d at 586. (Emphasis in original.)
The Eleventh Circuit's opinion actually frames the plaintiffs' claims as hypothetical, *1219 then concludes that they are sufficient to allege the violation of a constitutional right, as required under 42 U.S.C. § 1983. No one in Alabama or anywhere else knows who will win the election for Chief Justice when the uncounted ballots are counted. The results of the election have not been determined. The winner has not been certified. The loser, when the result is determined, has a statutory right to contest the election in the state legislature.
As a practical matter, it is only after all of the votes have been counted, the election results have been certified, and either the time for an election contest has elapsed, or a contest has been concluded, that conclusive effect is given to the ballots cast in an election. The validity and propriety of a given ballot are is reserved for determination in the election contest procedure provided under Alabama law. Reed v. City of Montgomery, 376 So.2d 708, 711 (Ala.1979). The election contest procedure embodied in § 17-15-1 et seq., Ala.Code 1975, was held by the Eleventh Circuit to provide an adequate procedure for addressing election irregularities. Curry v. Baker, 802 F.2d 1302, 1317 (11th Cir.1986).
The absentee ballots in question have yet to be given any legal, operative effect by the State of Alabama in these elections. Plaintiffs' contention that they will suffer a deprivation of their due process rights when these absentee ballots are counted is pure speculation. No one knows for whom these voters cast their ballots. Thus, there is a crucial flaw in the plaintiffs' claims of vote dilution. As of this date, the plaintiffs have suffered no harm. Because these absentee ballots have not been opened or counted, it is impossible to ascertain whether the plaintiffs' votes will be "diluted" by votes for the Democratic Party candidates as they claim, or "bolstered" by votes for the Republican Party nominees.
Our certification procedure permits us to answer questions from any United States court. It does not authorize us to answer hypothetical questions, and it assumes that a federal court certifying a question to us has jurisdiction of the underlying case. Our Constitution requires that there be an actual "case or controversy" in order for the federal courts to exercise subject matter jurisdiction. Article III, Section 2, U.S. Constitution. We question whether a hypothetical claim of deprivation of due process rights, such as exists in the present case, is sufficient to bestow jurisdiction on the federal courts.
The exact same question as that certified to us by the Eleventh Circuit is pending final determination in the Circuit Court of Montgomery County, Odom v. Bennett, CV-94-2434, where the lawyers representing the parties in that litigation are the same as those involved in the question certified to us by the Eleventh Circuit. Part of the record in Odom v. Bennett is before the Eleventh Circuit in this case and has been submitted to us by the Eleventh Circuit as part of its record in this case. Additional evidence has been presented to the Circuit Court, since the hearing was held before the Eleventh Circuit. Because the litigation presents a question of state law that is determinative of this certified question, this Court has directed the clerk of the Montgomery County Circuit Court to certify the record in Odom v. Bennett to this Court.[12] This enables this Court, notwithstanding its reservation to answer hypothetical questions, to answer the Eleventh Circuit in the context of a fully developed adversary proceeding in a case in which a direct appeal to this Court lies.
As the three-judge panel emphasized in Bradford v. Alabama, et al., CV-94-PT-2816-M *1220 (N.D.Ala., November 25, 1994), for this Court or any court to now hold that the ballots that met the three-prong test of Williams v. Lide are not to be counted, would, in and of itself, work a change in Alabama law. As the record in Odom establishes without contradiction and as the Justice Department noted in its letter to the Attorney General of Alabama and of record before the panel of U.S. district and circuit judges in Bradford, the actual practice and standards for accepting absentee ballots have varied considerably among Alabama's 67 counties, and the substantial compliance rule, or some variation of it, has been the rule in a number of Alabama counties for a considerable period.
The record in Odom v. Bennett, CV-94-2434, shows, without dispute, that absentee ballots, not in strict compliance with the witness requirements of § 17-10-7, were counted in some Alabama counties after the general election of November 8, 1994.[13] It is also undisputed that absentee ballots, legally and materially indistinguishable from those that were counted in some counties, were not counted in other counties.[14] Thus, a change to strict compliance would itself constitute a voting change with a potential for discrimination and would itself require Section 5 preclearance prior to any implementation by the state, notwithstanding the Code language.
The right to vote is precious to the citizens of Alabama, as it is to all citizens. As the United States Supreme Court stated in Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964):
"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined."
Therefore, the right of qualified citizens to vote in state and/or federal elections is protected under the Constitution of the United States. Reynolds v. Sims, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377-78, 12 L.Ed.2d 506 (1964); The Ku Klux Cases, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884); see also Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir.1978). In Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court said, "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." 377 U.S. at 555, 84 S.Ct. at 1378.
The United States Supreme Court has determined that qualified voters, in addition to having a constitutionally protected right to vote, also have a concomitant right to have their votes counted. United States v. Mosley, 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915); see also United States v. Classic, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037-38, 85 L.Ed. 1368 (1941); Gamza v. Aguirre, 619 F.2d 449, 452 (5th Cir.1980). The Constitution protects these rights and nullifies any state law that denies these rights to its citizens. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939).
Alabama state law governing absentee voting also reflects the public policy interest in allowing each qualified citizen the right to vote. The Alabama Supreme Court *1221 has joined a sizeable majority of jurisdictions in this country in holding that absentee voting laws should be liberally construed, as opposed to strictly construed, to accomplish the purpose for which they were adopted: to protect and further a citizen's right to vote. Wells v. Ellis, supra. Alabama's law has long been that "a voter should not be disfranchised by a rejection of his ballot, in whole or in part, when it is clear that he made an honest effort to comply with the law and has substantially complied with its mandatory requirements." Garrett v. Cuninghame, 211 Ala. 430, 438, 100 So. 845, 853 (1924); Campbell v. Jefferson County, 216 Ala. 251, 251, 113 So. 230, 230 (1927) (citations omitted; emphasis added); see Woodall v. City of Gadsden, 278 Ala. 634, 636, 179 So.2d 759, 761 (1965); Wells v. Ellis, 551 So.2d 382 (Ala.1989); Williams v. Lide, 628 So.2d 531, 536 (Ala.1993).
However, the fact that Alabama law requires election officials to count absentee ballots that are in substantial compliance with § 17-10-7, Ala.Code 1975, does not mean that all such ballots are free of challenge and are not subject to a determination of their validity, once challenged in an election contest. In this instance, that determination will be made in the legislature, if a contest is filed there. A voter's ballot is not an invalid ballot simply because the voter did not show up at the polls but instead cast his vote by absentee ballot. A voter, voting by absentee ballot, is not required to establish his right to have his vote counted any more than a voter casting his vote in person at the polls is required to ensure that his vote is counted. As the United States Supreme Court stated in United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915), "[T]he right to have one's vote counted is as open to protection ... as the right to put a ballot in a box." 238 U.S. at 386. Each individual is entitled to vote and to have his vote counted.
For over 70 years, decisions of this Court have consistently construed Alabama's election laws liberally, where possible, to permit Alabama citizens to express their will at the polls. In 1924, this Court held that an election could not be voided if the manner of conducting it substantially complied with the law. Garrett v. Cuninghame, 211 Ala. 430, 439, 100 So. 845, 853-54 (1924). Garrett involved an election contest between two Democratic candidates for probate judge of Clarke County, and whether the conduct of election officers, by requiring some voters to choose between (i) a ballot stamped with the addition of one of the candidates or (ii) an unstamped ballot, thus resulting in a public declaration of a voter's decision prior to obtaining a ballot, should be grounds for rejecting those votes. Garrett, 211 Ala. at 432, 439, 100 So. at 847, 854. This Court held that the conduct was a technicality that did not deny voters their right to freely choose the candidate of their choice. Garrett, 211 Ala. at 439, 100 So. at 854. As stated in Garrett:
"While before an election all provisions of an election law are mandatory, if sought to be enforced, after an election is held they are held to be directory only, if this is possible.... It is, therefore, very generally held that provisions of a statute as to the manner of conducting the details of an election are not mandatory, but directory merely, and irregularities in conducting an election and counting the votes, not proceeding from any wrongful intent, and which deprive no legal voter of his vote, will not vitiate an election, or justify the rejection of the entire poll of a precinct."
Id. (citations omitted).
In 1933, this Court held that absentee ballots cast on imperfect absentee vote forms were in substantial compliance with the statutes and must be counted. Pope v. Howle, 227 Ala. 154, 157, 149 So. 222, 224-25 (1933). In Pope, two contestants claimed that 21 votes in a municipal election had been wrongfully rejected; 13 were challenged ballots, and 8 were absentee ballots. Pope, 227 Ala. at 155, 156, 149 So. at 223. In an election contest, the trial court counted all 21 votes, and the election results were changed. An appeal followed, and this Court affirmed. 227 Ala. at 158, 149 So. at 225. Regarding the counting of absentee ballots, the Court stated:
"These eight votes were, however, counted for contestants as the legally expressed will of these voters. The fact that old or *1222 imperfect blanks were given such voters to execute will not here be permitted to change the result and to defeat the honest effort of these voters to discharge their high duty of citizenship."
227 Ala. at 157, 149 So. at 224.
In 1965, this Court allowed two votes to be counted in the contest of an annexation election, even though the voters' witness was not a qualified elector, as required by the rules of the board of registrars of Etowah County. Woodall v. City of Gadsden, 278 Ala. 634, 636, 179 So.2d 759, 760 (1965). In quoting the "established law" of Alabama, this Court held that the substantial compliance standard applied to statutory mandates regarding voting was also the standard applicable to the rules of local boards of registrars. Woodall, 278 Ala. at 636, 179 So.2d at 761.
In addition, the rule of substantial compliance with voting laws is consistent with the intent of the legislature. The procedures for counting votes are provided in § 17-13-1 et seq., Ala.Code 1975. Section 17-3-2 provides that a ballot, even when improperly marked, must be counted where it is possible to determine the voter's choice. The statute further states:
"[N]or shall any ballot be rejected for any technical error which does not make it impossible to determine the elector's choice, and nothing in the election law shall be construed so as to prevent any elector from voting for any qualified person other than those whose names are printed on the ballot."
Ala.Code 1975, § 17-13-2.
Alabama adopted its current statutory scheme authorizing voters to cast absentee ballots in 1975. Ala.Code 1975, § 17-10-1 et seq. Section 17-10-7, which requires an affidavit substantially in the form supplied by the statute, provides as part of the form a "note" stating that the absentee voter's signature "must be witnessed by either: A notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older." This statute was first addressed by this Court five years ago in Wells v. Ellis, 551 So.2d 382 (Ala.1989).
In Wells, two unsuccessful candidates in a municipal election contested the election results, claiming that they were defeated because illegal absentee votes were counted.[15]Wells, 551 So.2d at 382. The losing candidates argued that the absentee votes did not comply with § 17-10-7 because the accompanying affidavits had one of the following problems: (1) defective signatures, either by the absentee voter or a witness; (2) no dates; or (3) lack of a reason for voting absentee. Id. The trial court held that the statute permitting absentee voting gave a statutory privilege and should be strictly construed. This Court reversed the judgment of the trial court and held that, in the absence of fraud, gross negligence, or intentional wrongdoing, absentee ballots in substantial compliance with essential requirements of the absentee voting law should be counted if the irregularities do not adversely affect the sanctity of the ballot and the integrity of the election. Id. at 384-85.
In Wells, the Court adopted the Florida Supreme Court's rationale in Boardman v. Esteva, 323 So.2d 259 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976), which similarly construed Florida's absentee voting statute. In Boardman, the Florida Supreme Court held that its statute required only substantial compliance in order to have a valid absentee ballot and explained why this was so in the following language:
"`We first take note that the real parties in interest here, not in the legal sense but in realistic terms, are the voters. They are possessed of the ultimate interest and it is they whom we must give primary consideration. The contestants have direct interests certainly, but the office they seek is one of high public service and of utmost importance to the people, thus subordinating their interests to that of the people. Ours is a government of, by, and for the people. Our federal and state constitutions guarantee the right of the people to take an active part in the process of that government, which for most of our citizens *1223 means participation via the election process. The right to vote is the right to participate; it is also the right to speak, but more importantly the right to be heard. We must tread carefully on that right or risk the unnecessary and unjustified muting of the public voice. By refusing to recognize an otherwise valid exercise of the right of a citizen to vote for the sake of sacred, unyielding adherence to statutory scripture, we would in effect nullify that right.'"
Boardman, 323 So.2d at 263 (as quoted in Wells, 551 So.2d at 384.) The Boardman Court refused to discount the cast absentee ballots because of a mere "technical violation of the law." Wells, 551 So.2d at 384 (quoting Boardman, 323 So.2d at 263). Wells also adopted three factors listed in a 1984 Florida election dispute case, referred to by the Florida Supreme Court as the "Boardman factors," which must be met in order to satisfy a state's absentee voting requirement:
"`(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
"`(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
"`(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.'"
Wells, 551 So.2d at 384 (quoting Bolden v. Potter, 452 So.2d 564, 566 (Fla.1984), and citing Boardman v. Esteva, 323 So.2d 259, 263 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976)) (emphasis added).
Since 1989, this Court has clearly stated that election officials are required to count absentee ballots if such ballots are in substantial compliance with the requirements of § 17-10-7, Ala.Code 1975. The language of § 17-10-7, which states that the "affidavit which shall be used in general, special or municipal elections shall be substantially as follows," also indicates that the legislature intended an affidavit substantially in compliance with the statutory form. Ala.Code 1975, § 17-10-7 (emphasis added). Under Alabama law, the ballots of an entire voting block may not be summarily rejected by those charged with administering the election laws because of a technical failure to follow exactly the affidavit supplied in § 17-10-7.
As recently as 1993, in Williams v. Lide, 628 So.2d 531 (Ala.1993), this Court reaffirmed Alabama's law with regard to the duty of election officials to count absentee ballots and the authority of a trial court in an election contest to reject ballots that are not shown to be valid ballots once challenged. Like the Wells case, Williams also involved a local election contest between two candidates, who were competing for the Dallas County Commission, district 2. Williams, 628 So.2d at 533. The losing candidate, John T. Lide, alleged that many of the cast votes were illegal for a variety of reasons. Contests of these elections, are, by statute, heard by circuit courts. Ala.Code 1975, § 17-15-29. The circuit court agreed with Lide and entered a judgment for him, because, it held, he had received the most legal votes, but Williams appealed, as the victor in the original vote count.
The first issue on appeal in Williams involved a convicted felon's right to vote. According to Alabama's Constitution of 1901, Art. VIII, § 182, a person who has been convicted of a felony and has not been pardoned is disfranchised. See also, Ala.Code 1975, § 17-3-10. Lide proved that eight persons who voted in the election had been convicted of a felony and had not been pardoned. Williams, 628 So.2d at 533. The trial court held that the votes of each of these eight persons must be rejected, and this Court affirmed that holding.[16]
Second, the votes of 71 people who presented themselves to vote at the polling places were challenged, as permitted by § 17-4-127.[17] These voters cast challenged *1224 ballots after executing an oath administered by an election inspector, as provided by § 17-12-3. These votes were received and counted as required by Alabama law. Williams, 628 So.2d at 534 (citing Hawkins v. Persons, 484 So.2d 1072, 1073 (Ala.1986)). The challenged voters were allowed to testify at trial to explain any problems in their challenged ballots. After considering each challenged vote, the trial court held that some of the challenged votes were illegal and rejected them, while others were held to be legal votes and were accepted by the trial court. This Court affirmed.
The third issue involved whether certain absentee ballots were erroneously rejected by election officials because of alleged deficiencies. Williams, 628 So.2d at 536. At trial, Williams argued that 13 of the absentee ballots were improperly rejected by officials. Id. The trial court reviewed each absentee ballot and its accompanying affidavit to determine if each ballot substantially complied with § 17-10-7 and the three Boardman factors set forth in Wells v. Ellis, supra. The Williams Court then stated:
"Although Wells stands for the proposition that an absentee voter's affidavit need not be identical to the form contained in § 17-10-7, under Wells the affidavit must comply substantially with § 17-10-7 and its irregularities must not `adversely affect the sanctity of the ballot and the integrity of the election.' To fulfill these requirements from Wells, the trial court admitted into evidence only those absentee ballots that were accompanied by an affidavit containing the voter's (1) place of residence, (2) reason for voting absentee, and (3) signature. However, if an absentee voter's affidavit lacked any of those three elements, the trial court permitted the voter to testify at trial to supply the missing elements."
628 So.2d at 536 (emphasis added).
After examining the 13 absentee ballots and affidavits in accordance with the aforementioned standards, the trial court found that 7 of them met its "three-element test" (residence, reason, and signature) and were legal votes that must be counted. Id. None of these 7 ballots was notarized, and 6 of them were not witnessed at all, while the remaining ballot had been witnessed by only one witness.
Of the remaining 6 ballots that did not meet the three-element test, 4 ballots did not exhibit a signature, and two ballots did not exhibit an address. At trial, the court took testimony as to the 4 ballots without signatures, finding that as to two of the ballots the deficiencies were cured by testimony, and that as to the other two they were not. Id. The trial court refused to allow testimony as to the two ballots without an address, and they were not counted. Id. Thus, the trial court held that 9 of the 13 absentee ballots were legal and valid. This Court affirmed.
This Court, in Williams, reaffirmed the Boardman factors that had originally been adopted in Wells, supra, which provide the three requirements for determining whether an absentee vote complies with § 17-10-7. This Court stated the factors as follows:
"(a) that the voter was not guilty of `fraud, gross negligence, or intentional wrongdoing';
"(b) that the voter substantially complied `with the essential requirements of the absentee voting law'; and
"(c) that any irregularities in the vote do not `adversely affect the sanctity of the ballot and the integrity of the election.'"
Williams, 628 So.2d at 536 (citing 551 So.2d at 384 (quoting Bolden v. Potter, 452 So.2d 564, 566 (Fla.1984), and citing Boardman v. Esteva, 323 So.2d 259, 263 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976))).
In Williams, however, this Court, in adopting the trial court's three-element test, further provided that absentee ballots with "an affidavit containing the voter's (1) place of residence, (2) reason for voting absentee, and (3) signature" meet the Boardman factors for substantial compliance and must be counted. Id. This Court stated:
"[W]e conclude that the three-element test devised by the trial court was the most lenient test it could have used, under the *1225 circumstances, to determine whether affidavits were in substantial compliance with § 17-10-7 and whether any irregularities in them would `adversely affect the sanctity of the ballot [or] the integrity of the election.' ... Had the trial court been any more lenient, it would have effectively abolished § 17-10-7 and, necessarily, would have compromised the integrity of the election process."
628 So.2d at 537.
The public policy favoring the right to vote and to have one's vote counted and the public policy against disfranchising voters require only residence, reason, and signature to establish the validity of a ballot for the purpose of having that ballot counted. Such ballots, like all others, are of course subject to being challenged in an election contest. If any ballots are shown to be fraudulent in the context of a contest, they should be rejected. No evidence of fraud, gross negligence, or intentional wrongdoing has been shown in this case, nor has it been shown that any irregularities in the uncounted absentee ballots affect the sanctity of those ballots or the integrity of the election.
Finally, Alabama is not alone in applying the substantial compliance standard to voting laws. A majority of jurisdictions follows the same or a similar standard.[18] Although states interpret the term "substantial compliance" differently, many using a less stringent test than the three-element test (residence, reason, and signature) pronounced in Williams v. Lide, supra, most of them adhere to the importance of a citizen's right to vote and to have that vote counted, as opposed to concentrating on a technical violation of the law as a basis for disfranchising certain qualified voters. For example, as mentioned earlier, Florida adopted the substantial compliance standard for absentee voting laws in Boardman v. Esteva, 323 So.2d 259 (Fla.1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976), upon which Alabama relied in Wells v. Ellis, 551 So.2d 382 (Ala.1989). In its rationale, the Florida Supreme Court stated:
"In developing a rule regarding how far irregularities in absentee ballots will affect the result of the election, a fundamental inquiry should be whether or not the irregularity complained of has prevented a full, fair and free expression of the public will. Unless the absentee voting laws which have been violated in the casting of the vote expressly declare that the particular act is essential to the validity of the ballot, or that its omission will cause the ballot not to be counted, the statute should be treated as directory, not mandatory, provided such irregularity is not calculated to affect the integrity of the ballot or election."
Boardman, 323 So.2d at 265 (emphasis original).
The Colorado Supreme Court also relied on Boardman in adopting its rule of substantial compliance. Erickson v. Blair, 670 P.2d 749, 755 (Colo.1983). In Erickson, the election dispute over a seat on the Avon Metropolitan Board of Directors involved the improperly completed affidavits on the return envelopes of seven absentee ballots, including one with no address on the affidavit, and one that failed to include the voter's signature on the affidavit. Erickson, 670 P.2d at 751-52. While the trial court rejected the seven votes for failure to strictly comply with the statutory affidavit form, the Colorado Supreme Court, in reversing the decision and adopting the rule of substantial compliance, stated:
"We believe the time has come to interpret absentee voting legislation in light of the realities of modern life and the fundamental character of the right of suffrage. We live in a society which, to a great extent, depends upon mobility as an indispensable condition of progress. Many persons for legitimate reasons cannot be physically present at a polling place to cast their ballots on the day of election. These electors, no less than in-person voters, should be able to present their views on issues of public importance without being encumbered by an unyielding standard of statutory exactitude. Moreover, the right to vote is a fundamental right of the first order. Absentee voting legislation should not be construed in a manner that unduly *1226 interferes with the exercise of this right by those otherwise qualified to vote. Nor should the exercise of the voting right be conditioned upon compliance with a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters. A rule of strict compliance, especially in the absence of any showing of fraud, undue influence, or intentional wrongdoing, results in the needless disenfranchisement of absent voters for unintended and insubstantial irregularities without any demonstrable social benefit."
Id. at 754-55 (citations omitted).
According to Kentucky law, the omission by notaries public of the county and state in which they are commissioned is not sufficient grounds to reject absentee ballots, even though the missing information indicating results in the notarization being void. Harmon v. Wilson, 254 S.W.2d 693, 694 (Ky.1953).
Furthermore, while a minority of jurisdictions follows the strict compliance standard,[19] the compliance required with regard to these statutes is less stringent than that required with regard to residence, reason, and signature.

Conclusion
When all the rhetoric is stripped away, it appears that the federal courts have interrupted the state courts' determination of whether all the legal votes cast by Alabama citizens in the November 8 general election have been counted. Unless those absentee ballots that substantially comply with the law are counted, the voters who cast them have been disfranchised. The due process clause of the Alabama Constitution and cumulative clauses, read together, guaranteeing equal protection of the laws, Ala. Constitution of 1901, Art. I, §§ 1, 6, and 22, compel, as an answer to the question certified, that the absentee ballots in substantial compliance with the law are due to be counted.
We therefore answer the certified question from the Eleventh Circuit to this Court as follows: Absent a showing of fraud, gross negligence, or intentional wrongdoing, Alabama law requires the counting of all absentee ballots cast in the general election of November 8, 1994, which contain: (1) the place of residence of the person casting the ballot; (2) the reason for voting by absentee ballot; and (3) the signature of the voter. The appropriate place to make any such showing would be in the Legislature if an election contest is filed. Thus, any such absentee ballots at issue are to be opened, over challenges if made, and counted.
The appellees' motion for disqualification of Justices and appointment of a special court is denied by separate order attached as Appendix C. A certified copy of the record in Odom v. Bennett is to be forwarded to the Eleventh Circuit Court of Appeals as an integral part of this answer to the certified question.
QUESTION ANSWERED.
ALMON, SHORES, and INGRAM, JJ., concur.
COOK, J., concurs specially.
MADDOX, J., dissents.
HORNSBY, C.J., recused.
HOUSTON, J., recused (with statement indicating reasons for recusal).

APPENDIX A

MAJORITY JURISDICTIONAL SURVEY
Ala.Code § 17-10-7 (1987); Wells v. Ellis, 551 So.2d 382 (Ala.1989); Williams v. Lide, 628 So.2d 531 (Ala.1993);
Ariz.Rev.Stat.Ann. §§ 16-544, -547, -548 (1984 & Supp.1994) (no notarization or attestation is required, but §§ 16-550, -552 require two-tier signature comparisons); Az. Op.Atty.Gen. No. 179-248 (Oct. 4, 1979) (states that previous Arizona case law requires only substantial compliance with election requirements);
Ark.Code Ann. § 7-5-409 (Michie 1993) (no notarization or attestation is required); Forrest v. Baker, 287 Ark. 239, 698 S.W.2d 497 (1985) (holding that "out of town" as a reason *1227 for seeking an absentee ballot is substantial compliance with the statute requiring a reason to be given);
Cal.Elec.Code § 3011 (West 1995) (no notarization or attestation is required, but §§ 3009(a) and 3019 require two-tier signature comparisons); Wilks v. Mouton, 42 Cal.3d 400, 722 P.2d 187, 229 Cal.Rptr. 1 (1986), cert. denied, 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987) ("Non-compliance with the directory provisions of the Elections Code will not nullify a vote." While the legislature the following year added the word "mandatory" to the statutes, subsequent case law has followed a substantial compliance standard.);
Colo.Rev.Stat.Ann. §§ 1-8-114, 1-8-115 (West 1980 & Supp.1994) (no notarization or attestation is required); Erickson v. Blair, 670 P.2d 749 (Colo.1983) (rejects the rule of strict compliance and adopts a standard of substantial compliance which "is adequate to the task of both preventing fraud in elections and preserving the absent voter's right of suffrage against unnecessary and technical restrictions");
Conn.Gen.Stat.Ann. §§ 9-137, 9-139 (West 1995) (no notarization or attestation is required, but § 9-140 requires that absentee ballot may be mailed only to the voter's personal address); Gargano v. Downey, 30 Conn.Supp. 254, 309 A.2d 347 (1973) (holding that Connecticut follows the substantial compliance standard);
Fla.Stat.Ann. §§ 101.64, 101.65 (West 1992) (absentee voter must sign envelope and signature must be witnessed by two persons); Boardman v. Esteva, 323 So.2d 259 (Fla. 1975), cert. denied, 425 U.S. 967, 96 S.Ct. 2162, 48 L.Ed.2d 791 (1976) (This case applied the substantial compliance standard to Florida's absentee voting laws. In this case, some electors had failed to sign their ballots, but because their names were written somewhere on their ballots and witnesses had signed them, the Court allowed the ballots to be counted even though they did not technically comply with the statutes.); McLean v. Bellamy, 437 So.2d 737 (Fla.Dist.Ct.App. 1983) (stating that witness requirements were directory and not mandatory); Bolden v. Potter, 452 So.2d 564 (Fla.1984) ("We reiterate our previous statement that courts must not interfere with an election process when the will of the people is unaffected by the wrongful conduct.");
Ga.Code Ann. §§ 21-2-381, 21-2-384, 21-2-386 (Michie 1993) (No notarization or attestation is required, unless the elector needs assistance, but there is a one-tier signature comparison, and the ballots may be mailed only to the voter's permanent mailing address.);
Haw.Rev.Stat. § 15-6 (1985) (no notarization or attestation is required, but § 15-9 requires a one-tier signature comparison); Thirty Voters of Kauai County v. Doi, 61 Haw. 179, 599 P.2d 286 (1979) (applying rule of substantial compliance to Hawaii's general election laws);
Idaho Code § 34-1004 (1981) (no notarization or attestation is required, but § 34-1008 requires a one-tier signature comparison); McCall v. Martin, 74 Idaho 277, 262 P.2d 787 (1953) ("[W]hen a ballot is sufficiently plain to gather therefrom a part of the voter's intention, it should be the duty of the judges to count such part.") (citing Idaho Code § 34-1202 (1891));
Ill.Ann.Stat. ch. 10, para. 5/19-5, 5/19-9 (Smith-Hurd 1993) (Under Illinois law, no notarization or attestation is required, but the statute requires a one-tier signature comparison. The statute states "must substantially follow this form."); Craig v. Peterson, 39 Ill.2d 191, 233 N.E.2d 345 (1968) (holding that substantial compliance with statutory requirement of initialing of ballots was directory rather than mandatory in absentee ballot situation); Bazydlo v. Volant, 264 Ill. App.3d 105, 636 N.E.2d 1107, 201 Ill.Dec. 675 (1994), aff'd, 164 Ill.2d 207, 647 N.E.2d 273, 207 Ill.Dec. 311 (1995); Pullen v. Mulligan, 138 Ill.2d 21, 561 N.E.2d 585, 149 Ill.Dec. 215 (1990) ("Literal compliance with directory provisions will not be required if it appears that the spirit of the law has not been violated and the result of the election has been fairly ascertained.");
Ind.Code Ann. §§ 3-11-4-21, 3-11-10-4 (Burns 1993 & Supp.1994) (no notarization or *1228 attestation is required, but there is a one-tier signature comparison);
Iowa Code Ann. § 53.16 (West 1995) (no notarization or attestation is required) Lee v. Rand, 299 N.W.2d 486 (Iowa 1980) (applying rule of substantial compliance to Iowa's election laws);
Kan.Stat.Ann. § 25-1124 (1993) (no notarization or attestation is required); Willmeth v. Harris, 195 Kan. 322, 403 P.2d 973 (1965) (applying substantial compliance standard); Hansen v. Lindley, 152 Kan. 63, 102 P.2d 1058 (1940) (minor discrepancies in notarization did not affect the validity of the absentee ballots);
Ky.Rev.Stat.Ann. § 117.086 (Baldwin 1993) (no notarization or attestation is required); Rives v. Pettit, 513 S.W.2d 475 (Ky.Ct.App. 1974) (stating that absentee ballots did not have to be eliminated because of the irregular manner in which they were handled and counted);
La.Rev.Stat.Ann. § 18:1310 (West 1979 & Supp.1995) (absentee ballot must be notarized or attested by two witnesses); Brunet v. Evangeline Parish Bd. of Supervisors of Elections, 379 So.2d 271 (La.Ct.App.1979) (A recount of absentee ballots conducted prior to the removal of a restraining order constituted substantial compliance with absentee voting laws.);
Me.Rev.Stat.Ann. tit. 21-A, §§ 754-A(1)(c), 754-A(3) (West 1993) (no notarization or attestation is required, unless the elector needs assistance, but § 756(2) requires a one-tier signature comparison); Kelly v. Curtis, 287 A.2d 426 (Me.1972) (stating that Maine generally uses a "liberal construction" standard to determine the meaning of the constitutional provisions that relate to the holding of special elections for the enactment or rejection at the polls of measures initiated by the people);
Md.Elec.Code Ann. Art. 33 §§ 27-4, 27-9 (1993) (no notarization or attestation is required);
Mass.Gen.Laws Ann. ch. 54, §§ 87, 92, 97 (West 1990 & Supp.1994) (no notarization or attestation is required, but §§ 91 and 94 require a one-tier signature comparison); Colten v. City of Haverhill, 409 Mass. 55, 564 N.E.2d 987 (1991) (applying rule of substantial compliance to allow votes that lacked addresses and reasons for voting absentee); Connolly v. Secretary of Commonwealth, 404 Mass. 556, 536 N.E.2d 1058 (1989) (This case applied rule of substantial compliance to allow unwitnessed votes to be counted. The witness lines of the absentee ballot affidavit forms had erroneously been omitted, but because of other adequate safeguards, such as the elector's address, place of voting, the date the ballot was mailed, and an affidavit signed by the elector, the votes were counted.);
Mich.Comp.Laws Ann. §§ 168.764, 168.764A, 168.766 (West 1989 & Supp.1994) (no notarization or attestation is required, but there is a one-tier signature comparison); Andrews v. Branigin, 21 Mich.App. 568, 175 N.W.2d 839 (1970) (This case applied a substantial compliance standard to Michigan election laws. "The general intent of the act as a whole must be considered; effectuation of the purpose of a statute should if possible prevail over its strict letter when construing the statute.");
Minn.Stat.Ann. §§ 203B.07(2), 203B.21 (West 1994) (absentee ballot must be notarized or witnessed); Matter of Contest of School Dist. Election Held on May 17, 1988, 431 N.W.2d 911 (Minn.Ct.App.1988) ("Election resulting in fair and free expression of will of legal voters will not be invalidated because of departure from statutory regulations governing conduct of election, except in those cases where legislature has clearly and unequivocally expressed intent that specific statutory provision is essential jurisdictional prerequisite.");
Mo.Ann.Stat. § 115.291 (Vernon 1994) (absentee ballot must be notarized); Application of Lawrence, 353 Mo. 1028, 185 S.W.2d 818 (1945) ("Election laws must be liberally construed in aid of the right of suffrage.");
Mont.Code Ann. §§ 13-13-221, 13-13-241 (1993) (no notarization or attestation is required, but § 13-13-213(1) requires two-tier signature comparison); Maddox v. Board of State Canvassers, 116 Mont. 217, 149 P.2d 112 (1944) (applying a substantial compliance standard to Montana election laws; concerned *1229 voting compliance by those in the military);
Nev.Rev.Stat. § 293.330 (1995) (no notarization or attestation is required, but § 293.325 requires one-tier signature comparison);
N.H.Rev.Stat.Ann. §§ 657:17, 657:20 (1986 & Supp.1994) (no notarization or attestation is required, but § 659:50 requires one-tier signature comparison);
N.J.Stat.Ann. §§ 19:57-16, 19:57-17, 19:57-23, 19:57-24 (West 1989 & Supp.1994) (no notarization or attestation is required, unless the elector needs assistance, but there is a one-tier signature comparison); Petition of Livingston, 83 N.J.Super. 98, 199 A.2d 37 (1964), cert. denied, Livingston v. O'Donnell, 42 N.J. 420, 201 A.2d 62 (1964) (In this case, a candidate notarized absentee ballots, and the court stated that absent any showing of fraud, there is no reason to disfranchise those voters because the New Jersey legislature has provided that absentee voting laws should be liberally construed.);
N.M.Stat.Ann. § 1-6-9 (Michie Supp.1994) (no notarization or attestation is required); Kiehne v. Atwood, 93 N.M. 657, 604 P.2d 123 (1979) (rejected seven absentee votes not notarized in the presence of the elector);
N.Y.Elec.Law §§ 7-122, 8-410 (McKinney 1978 & Supp.1995) (no notarization or attestation is required, but § 9-104 requires one-tier signature comparison); St. John v. Board of Elections of County of Albany, 145 Misc.2d 324, 546 N.Y.S.2d 301 (N.Y.Sup.Ct. 1989) (indicating that New York applies a substantial compliance standard in applying election laws); Application of Egan, 134 Misc.2d 500, 511 N.Y.S.2d 465 (N.Y.Sup.Ct. 1986) (The court held that no date was needed on the absentee ballot in order to substantially comply. "The right of the voter to be safeguarded against disfranchisement and to have his intent implemented ... transcends technical errors.");
N.C.Gen.Stat. §§ 163-227, 163-229 (1994) (absentee ballot must be witnessed by two persons);
N.D.Cent.Code § 16.1-07-08 (1991 & Supp. 1993) (no notarization or attestation is required, but § 16.1-07-12 requires one-tier signature comparison); Mittelstadt v. Bender, 210 N.W.2d 89 (N.D.1973) (This case applied a substantial compliance standard in an absentee ballot case. "Our statutes are to be liberally construed to effect their objects and promote justice."); but cf. Kuhn v. Beede, 249 N.W.2d 230 (N.D.1976) (A statutory provision that absentee ballots must be endorsed with an official stamp and the initials of election official was held mandatory.);
Ohio Rev.Code Ann. §§ 3509.04, 3509.05 (Baldwin 1988 & Supp.1993) (no notarization or attestation is required, but § 3509.06 requires one-tier signature comparison); Martin v. Porter, 353 N.E.2d 919 (Ohio Com.Pl. 1976) ("All provisions of election laws are mandatory in the sense that they impose the duty of obedience on those who come within their purview; however, irregularities which are not caused by fraud and which do not interfere with a full and fair expression of the voter's choice should not effect a disfranchisement of the voters.");
Okla.Stat. tit. 14, §§ 107-08 (1991) (voter's affidavit must be notarized);
Or.Rev.Stat. § 253.065 (1986) (no notarization or attestation is required, but § 253.080 requires one-tier signature comparison);
Pa.Stat.Ann. tit. 25, § 3146.6 (1994) (no notarization or attestation is required, unless the elector needs assistance);
R.I.Gen.Laws § 17-20-21 (1988 & Supp. 1994) (absentee ballot must be notarized or attested by two witnesses); § 17-20-26 requires statute to be liberally construed. Ball v. Board of Elections, 102 R.I. 227, 229 A.2d 617 (1967) (applying a substantial compliance standard for Rhode Island's general election laws);
S.C.Code Ann. §§ 7-15-380, 7-15-385 (Law. Co-op.Supp.1993) (absentee ballot must be witnessed); Knight v. State Bd. of Canvassers, 297 S.C. 55, 374 S.E.2d 685 (1988) (liberally construing South Carolina absentee voting laws and allowing absentee ballots that did not comply with technical statutory requirements to be counted); but cf. Gregory v. South Carolina Democratic Executive Comm., 271 S.C. 364, 247 S.E.2d 439 (1978) (The court declined to count unwitnessed ballots, *1230 although South Carolina's absentee voting statute is stricter than Alabama's statute. Specifically, according to South Carolina law, "no ballot shall be counted unless the oath is properly signed and enclosed therewith");
Tex.Elec.Code Ann. §§ 86.005, 87.041 (1986 & Supp.1995) (no notarization or attestation is required, but there is a one-tier signature comparison); Fugate v. Johnston, 251 S.W.2d 792 (Tex.Ct.App.1952) (An election contestant challenged 58 absentee votes for reasons such as nonresidence, below voting age, alienage, etc., but the court said it would not use the Election Code as "an instrument for disfranchisement for irregularities of procedure."); Lee v. Whitehead, 182 S.W.2d 744 (Tex.Ct.App.1944) (An absentee ballot unaccompanied by an application or an affidavit was still counted because these statutory requirements were directory and partly because the mistake was due to an election official.); Alvarez v. Espinoza, 844 S.W.2d 238 (Tex.Ct.App.1992); Garza v. Salinas, 434 S.W.2d 153 (Tex.Civ.App.1968) (Both of these cases rejected ballots because of inadequate signature comparisons. In Garza, the court suspected that the votes were cast illegally.);
Utah Code Ann. §§ 20A-3-305, 20A-3-308 (Supp.1994) (no notarization or attestation is required, but there is a one-tier signature comparison);
Vt.Stat.Ann. tit. 17, § 2540-42 (1982 & Supp. 1994) (no notarization or attestation is required); Conn v. Town of Brattleboro, 120 Vt. 315, 140 A.2d 6 (1958) (This case applied a substantial compliance standard in upholding a municipal election, even though the defective notice of the election was a deviation from the exact statutory language.);
Wash.Rev.Code Ann. § 29.36.045 (West 1994) (no notarization or attestation is required, but § 29.36.060 requires one-tier signature comparison);
W.Va.Code §§ 3-3-1, 3-3-5, 3-4A-21 (1994) (no notarization or attestation is required, but absentee voters must generally vote in person in the office of the clerk of the circuit court) State ex rel. Heavener v. Perry, 155 W.Va. 353, 184 S.E.2d 136 (1971) ("The failure of a voter to perform an act prescribed by an election statute will not deprive him of the privilege of voting unless the statute plainly and clearly, by express provision or necessary implication, requires that result."); State ex rel. McKown v. Board of Canvassers of Berkeley County, 113 W.Va. 498, 168 S.E. 793 (1933); ("The intention of the voter, when ascertainable, is `the guiding star' in ascertaining for whom a ballot shall be counted.");
Wis.Stat.Ann. § 6.87 (West 1991-92) (absentee ballot must be notarized or attested by two witnesses); Matter of Hayden, 105 Wis.2d 468, 313 N.W.2d 869 (1981) (Substantial compliance with delivery of the ballots was acceptable, as was a delayed addition of a date by a notary. "Strict compliance with a directory statute is not required."); Lanser v. Koconis, 62 Wis.2d 86, 214 N.W.2d 425 (1974).

APPENDIX B

MINORITY JURISDICTIONAL SURVEY
Alaska Stat. § 15.20.081 (1988 & Supp.1994) (absentee ballot must be notarized or attested by two witnesses); Finkelstein v. Stout, 774 P.2d 786 (Alaska 1989) (This case required, in a 3-2 decision, strict compliance with the statute; however, the State argued for substantial compliance. The dissenting justices said they would not penalize absentee voters because election officials did not furnish unambiguous instructions.);
Del.Code Ann. tit. 15 §§ 5506, 5509 (1993) (While no notarization or attestation is required, signatures are compared. The voter need only sign a self-administered affidavit on the mailing envelope.);
Miss.Code Ann. § 23-15-631 (1990) (absentee ballot must be witnessed by the county registrar) (Section 23-15-635 uses the statutory language "shall"; Alabama's statute uses the language "substantially."); Fouche v. Ragland, 424 So.2d 559 (Miss.1982) (the court stated that a notary's signature could not also duplicate and serve as a witness's signature because, according to Mississippi statute, "a [absentee] ballot should be rejected if there is a defect in the execution of the outside of the envelope containing an absentee ballot"); but cf. Walker v. Smith, 213 *1231 Miss. 255, 56 So.2d 84 (1952) ("[T]he legislature was endeavoring to provide means for absent voters to exercise their right of suffrage. The result, therefore, ought not to be lightly tossed aside, unless the irregularity has prevented a full, fair and free expression of the public will. Especially is this true when the special tribunal found as a fact that there was no fraud or intentional wrongdoing in this regard.");
Neb.Rev.Stat. § 32-835, 32-841 (1993) (no notarization or attestation is required, but § 32-841 requires one-tier signature comparison); McMaster v. Wilkinson, 145 Neb. 39, 15 N.W.2d 348 (1944) (Absentee ballots on which there are "but formal mistakes, perhaps a mere clerical and careless error, while the essential facts required by law can still be ascertained," were counted, although the court pointed out that absentee voting laws have generally received strict construction.);
S.D.Codified Laws Ann. §§ 12-19-4,7 (1982 & Supp.1994) (no notarization or attestation is required, but § 12-19-10 requires one-tier signature comparison); Brown v. Dakota Pub. Serv. Co., 68 S.D. 169, 299 N.W. 569 (1941) (Absentee voters "should be required to strictly comply with the requirements of the statute in order to prevent fraud and preserve the purity and integrity of elections.");
Tenn.Code Ann. §§ 2-6-101 to 2-6-503 (1994) (notarization is required, as well as a one-tier signature comparison); (Section 2-6-101(c) states that "[t]o prevent fraud in an election, strict compliance with the provisions of this chapter is required."); Lanier v. Revell, 605 S.W.2d 821 (Tenn.1980) (holding that, prior to the above-enacted statute, although rule of substantial compliance applied with respect to Tennessee election laws generally, a strict compliance standard applied to absentee voting laws); Payne v. Ramsey, 591 S.W.2d 434 (Tenn.1979) (stating that improperly executed affidavits were reason to reject absentee ballots); but cf. Lanier, supra, which also stated that a mere technical violation on the part of a deputy registrar would not cause a ballot to be rejected; Foust v. May, 660 S.W.2d 487 (Tenn.1983) (registrar's failure to certify that signature comparisons were done does not cause ballots to be rejected);
Va.Code Ann. § 24.2-707 (Michie 1993) (Absentee ballot must be witnessed.); (Section 24.2-707 states that "[f]ailure to follow the procedures set forth above shall render the applicant's ballot void.");
Wyo.Stat. § 22-9-110 to -113 (1992) (no notarization or attestation is required); Fugate v. Mayor & City Council of Town of Buffalo, 348 P.2d 76 (Wyo.1959) ("The right of absentee and disabled voters to cast their ballot at an election is purely statutory" and "will be strictly construed.").

APPENDIX C

IN THE SUPREME COURT OF ALABAMA

March 14, 1995
MOTION FOR DISQUALIFICATION OF JUSTICES AND APPOINTMENT OF SPECIAL COURT

ORDER
The appellees' motion for disqualification of Justices and appointment of special court is denied.
The objection to members of this Court deciding this question by the Roe plaintiffs/appellees to this litigation comes too late. The alleged disqualification of the members of this Court to sit should have been raised in the Eleventh Circuit. It was that Court which certified the question to this Court, and all parties here were parties to the proceeding in which the question was certified. If any party had any objection to a member of this Court sitting on the certified question, he should have raised it by objecting to the certification of the question to this Court.
Attorneys are officers of the courts before whom they practice. The attorneys for the Roe plaintiffs/appellees had an affirmative duty to disclose any matter that would affect the integrity of the proceedings. For these attorneys to fail to object before the United States Circuit Court for the Eleventh Circuit had certified what it held to be a determinative *1232 question of state law to this Court; to ask that the briefing time be shortened and the appeal expedited; to permit the full briefing cycle to run; to wait until the case was ready for decision; and then, when the decision of this Court was in draft form and was literally ready for release within days, to raise matters which have been public knowledge for months as grounds for recusal, approaches unacceptable conduct. It is certainly conduct indicating a lack of understanding of a lawyer's responsibility as an officer of this Court and of the Eleventh Circuit Court of Appeals, if not indicating an outright disrespect for both Courts.
Whether a judge or justice can fairly decide a case without bias or prejudice to either side is a matter confided to the conscience of each individual judge or justice. Although the method of electing judges by partisan popular elections is an imperfect one, it is the one the people of Alabama have selected. The fact that a member of this Court made a campaign contribution in a judicial election campaign to another member of this Court standing for re-election in no way suggests that either Justice is incapable of rendering a fair decision on the legal question before this Court regarding absentee ballots. A judge has a duty, in the absence of bias or prejudice, to hear a case to conclusion, and he should not avoid sitting on difficult or controversial cases in the absence of disqualification.
It is the general rule in Alabama that there is a presumption that a judge is qualified and unbiased, and a person who alleges otherwise has the burden of proving the grounds for this allegation. McMurphy v. State, 455 So.2d 924, 929 (Ala.Crim.App. 1984). Prejudice on the part of a judge is not presumed. "`The law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.'" Ex parte Balogun, 516 So.2d 606, 609 (Ala.1987) (quoting Fulton v. Longshore, 156 Ala. 611, 46 So. 989 (1908)).
There are no statutory grounds that would disqualify the challenged Justices, nor are there grounds that would require us to recuse ourselves. There are no indictments or inquiries pending that would trigger Amendment 328, § 6.19, Ala. Const. 1901. No Justice ruled on this case below, so § 12-1-13, Ala.Code 1975, does not apply. No Justice is related to any of the parties by kinship or affinity, and no Justice has represented any of the parties as their attorney, so no ground for recusal based on relationship or legal representation exists.
The movants rely on the general language recited in Canon 3(c)(1), Canons of Judicial Ethics, which requires a judge to disqualify himself in a proceeding in which "his impartiality might reasonably be questioned." They question the impartiality of Justices Shores, Almon, and Ingram on the grounds that these Justices made campaign contributions to the campaign of Chief Justice Hornsby. They question the impartiality of Justices Kennedy, Cook, and Butts because they were candidates who, the movants assert, received campaign contributions from attorneys who represent the Davis class.
The movants cite the Court to Canon 7(A)(1), Canons of Judicial Ethics, concerning political conduct of judges. The movants neglect to note, however, that this Canon recognizes that in a system in which judges are elected by the people, judges are not expected to be entirely isolated from political involvement:
"A. Political Conduct in General.
"1.... It is desirable that a judge or a candidate for election to judicial office endeavor not to be involved in the internal workings of political organizations, engage in campaign activities in connection with a political candidate other than candidates for judicial offices and not be involved in political fund solicitations other than for himself. However, so long as judges are subject to nomination and election as candidates of a political party, it is realized that a judge or a candidate for election to a judicial office cannot divorce himself completely from political organizations and campaign activities which, indirectly or directly, may be involved in his election or re-election."
Rule 7(A)(1), Canons of Judicial Ethics. This Canon is not authority for the proposition *1233 that a $500 contribution from a judge to judicial candidates requires recusal of the contributing judge.[20]
In Texas, where judges must also stand for election, "Texas courts have repeatedly rejected the argument that campaign contributions might create a bias to prompt recusal." J-IV Invs. v. David Lynn Mach., Inc., 784 S.W.2d 106, 107 (Tex.App.1990); River Road Neighborhood Ass'n v. South Texas Sports, Inc., 673 S.W.2d 952 (Tex.App.1984). The reasoning of the Texas courts is stated in Rocha v. Ahmad, 662 S.W.2d 77, 78 (Tex. App.1983):
"Under our system, which requires that candidates for judicial office stand for election, it is necessary, unfortunately, that candidates for judicial office seek contributions for the purpose of defraying all or part of the expenses of what is, in reality, a political campaign. Such a candidate in a contested race must spend substantial amounts of money, particularly where, as is the case of one seeking election to the appellate bench, he is forced to campaign in 32 counties.
"It is not surprising that attorneys are the principal source of contributions in a judicial election. We judicially know that voter apathy is a continuing problem, especially in judicial races and particularly in contests for a seat on an appellate bench. A candidate for the bench who relies solely on contributions from nonlawyers must reconcile himself to staging a campaign on something less than a shoestring. If a judge cannot sit on a case in which a contributing lawyer is involved as counsel, judges who have been elected would have to recuse themselves in perhaps a majority of the cases filed in their courts. Perhaps the next step would be to require a judge to recuse himself in any case in which one of the lawyers had refused to contribute or, worse still, had contributed to that judge's opponent."
The reasoning of the Texas court is applicable in Alabama as well.
The contributions of Judge Foy Guin to the University of Alabama did not require his recusal in Wu v. Thomas, 996 F.2d 271, 275 (11th Cir.1993), cert. denied, Wu v. Board of Trustees, Univ. of Alabama, ___ U.S. ___, 114 S.Ct. 1543, 128 L.Ed.2d 195 (1994). Judge U.W. Clemon, who had given a pre-judgeship contribution to Senator Donald Stewart, did not find this to be grounds for recusal, stating: "I have painstakingly searched and reviewed all the relevant papers and, most importantly my conscience, and I know of no facts which would cause a reasonable person to harbor doubts as to my impartiality in this proceeding." U.S. v. Alabama, 574 F.Supp. 762, 766 (N.D.Ala.1983), aff'd, 762 F.2d 1021 (11th Cir.1985); see also Matter of Mason, 916 F.2d 384, 388 (7th Cir.1990). It is only when there is a direct, pecuniary interest that recusal is required. Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). That does not exist in this case.
We are the only judges elected by the people of Alabama to serve as a Court of last resort. There is no legal reason for us to recuse ourselves in this case. It is inappropriate for us to step aside and have persons not elected by the people of Alabama decide this important case. Given the nature and the urgency of the proceedings, we must discharge our duties as members of the judicial branch of government. It is always difficult to make decisions that may be controversial, but our oaths require us to make the difficult decisions as well as the easy ones. Given the importance of the issue in this case to the citizens of Alabama, we must perform our judicial function.
We do not believe the campaign contributions mentioned herein create a situation in which our impartiality might reasonably be questioned. The contributions by attorneys for the Davis class to the campaign of Justices Kennedy, Cook, and Butts are no different from contributions by attorneys for any other litigants. Such contributions have uniformly been held not to constitute grounds for recusal. The contributions to Chief Justice Hornsby's campaign by Justices Almon, Shores, and Ingram are not disqualifying indications of partiality that would interfere with these Justices' ability to decide the certified *1234 question and the appeal according to the law. Rather, these contributions reflect collegial courtesy expressed in a time before this controversy arose.
MOTION DENIED.
ALMON, SHORES, INGRAM, and COOK, JJ., concur.

RECUSAL STATEMENT
HOUSTON, Justice (recused).
I have attached as appendices to this statement the materials that form the basis for my recusal in this case.
*1235 
*1236 
*1237 
*1238 
*1239 
*1240 
*1241 
*1242 

SPECIAL CONCURRING OPINION
COOK, Justice (concurring specially) [opinion issued March 15, 1995].
I concur in all respects with the majority opinion. However, I deem it necessary to write specially in order to address an issue raised in the dissent, namely, the question of the state court's subject-matter jurisdiction.
As the dissent observes, the Court of Appeals for the Eleventh Circuit pointedly suggested that the Montgomery County Circuit Court lacked subject-matter jurisdiction over this dispute, and, consequently, that its preliminary injunction was void. See Roe v. Alabama, 43 F.3d 574, 577 (11th Cir.1995). The jurisdictional impediment, the court opined, is § 17-15-6, Ala.Code 1975, which provides in pertinent part:
"No jurisdiction exists in or shall be exercised by any judge, court or officer exercising chancery powers to entertain any proceeding for ascertaining the legality, conduct or results of any election, except so far as authority to do so shall be specially and specifically enumerated and set down by statute; and any injunction, process or order from any judge, court or officer in the exercise of chancery powers, whereby the results of any election are sought to be inquired into, questioned or affected, or whereby any certificate of election is sought to be inquired into or questioned, save as may be specially and specifically enumerated and set down by statute, shall be null and void and shall not be enforced by any officer or obeyed by any person...."
Jurisdiction was absent, it is suggested, because the legislature investednot in circuit courtsbut in "[t]he two houses of the Legislature, in joint convention assembled," Ala. Code 1975, § 17-15-52, authority to entertain election contests.[1] As I shall demonstrate, this suggestion flies in the face of well-established rules of statutory construction and the long-settled case law of this state.

A. Statutory Construction
"`The right to contest an election is not a common-law right.'" Longshore v. City of Homewood, 277 Ala. 444, 446, 171 So.2d 453, 455 (1965) (emphasis added). It accrues "only by virtue of statutory enactment," 277 Ala. at 446, 171 So.2d at 455, and statutes granting this right "are to be strictly construed as to those provisions for inaugurating the contest, and which are necessary to invoke jurisdiction." Groom v. Taylor, 235 Ala. 247, 251, 178 So. 33, 36 (1937) (emphasis added).
This rule must be considered in conjunction with the principle that where a statute "is ambiguous or uncertain, the court may consider conditions which might arise under the provisions of the statute and examine results that will flow from giving the language in question one particular meaning rather than another." Clark v. Houston County Comm'n, 507 So.2d 902, 903 (Ala. 1987). Also, statutes are to be construed in a *1243 manner "that is consistent with related statutory provisions." John Deere Co. v. Gamble, 523 So.2d 95, 100 (Ala.1988) (emphasis added); see also Abramson v. Hard, 229 Ala. 2, 7, 155 So. 590, 594 (1934) (legislative intent is discernible from the construction of a statute in relation to "`the whole law, or [to] other laws, in pari materia'"). In considering the scope of § 17-15-6, we seek a construction that is consistent with these rules.
The scope of § 17-15-6 is twice expressed in the text of the section. Section 17-15-6 effectively invests the joint convention with exclusive jurisdiction to "entertain any proceeding for ascertaining the legality, conduct or results of any election," and, conversely, divests the judiciary of "the exercise of chancery powers, whereby the results of any election are sought to be inquired into [or] questioned." The section's focal point, however, is the result of an election. Election results are the peculiar concern and focus of election contests. Thus, § 17-15-6 must be construed in pari materia with associated sections in chapter 15, entitled "Contesting Elections."
Indeed, of the 36 sections contained in chapter 15, § 17-15-6 is one of only three sections in which the term "contest," or a form thereof, does not appear in the body of the text, or in which express reference is not made to another section containing that term. The remaining sections in chapter 15 are devoted specifically to this end, that is, they define the grounds for election contests,[2] establish substantive and procedural conditions for the institution of contest actions,[3] and provide the mechanisms for securing evidence and testimony in the dispositions of such actions.[4] These sections define the context in which § 17-15-6 applies, and they identify the extent of its jurisdictional bar as encompassing only actions of a truly judicial nature, namely, actions initiated to adjudicate the results of a contested election.
The Montgomery County Circuit Court did not, under any interpretation of the facts in this case, purport to adjudicate an election contest. On the contrary, the trial judge defined his role as "`limited [to the] purpose of ordering public officials to comply with legal principles.'" See 43 F.3d at 579 n. 6. The exercise of jurisdiction for such a purpose has long been a part of the case law of this state.

B. Case Law
All parties must first concede that, as a general rule, the performance of a ministerial act may be compelledeven of state officers in their official capacitiesby a circuit court in the exercise of its extraordinary remedial powers. McDowell-Purcell, Inc. v. Bass, 370 So.2d 942, 944 (Ala.1979); Hardin v. Fullilove Excavating Co., 353 So.2d 779 (Ala.1977). Similarly, acts of such officials that are "illegal, fraudulent, unauthorized, done in bad faith or under a mistaken interpretation of law," may be enjoined. 370 So.2d at 944 (emphasis added); see also Wallace v. Board of Education of Montgomery Co., 280 Ala. 635, 197 So.2d 428 (1967). More specifically, from the inception of Act No. 19, 1875 Ala. Acts 101, first codified, Ala.Code 1876, § 314, the progenitor of § 17-15-6, this Court has held that the exercise of jurisdiction to compel performance of ministerial acts incident to elections does not violate the provisions of § 17-15-6.
*1244 For example, merely six years after the adoption of Act No. 19, this Court, in Hudmon v. Slaughter, 70 Ala. 546 (1881), addressed the exercise of jurisdiction over actions brought to compel election officials to count ballots and canvass returns. That case arose out of an election held pursuant to the charter of the City of Opelika, Alabama, for the office of alderman of that city. Id. at 549. The "board of supervisors" refused to count ballots that had been cast for Slaughter, and, instead, passed a resolution purporting to void his election. Id. Slaughter, alleging that he had been duly elected to the office, sought a writ of mandamus from the Lee County Circuit Court, directing the "[board of supervisors] to count the votes, as shown in the returns made to them, and to certify the result." Id. The respondents answered and opposed the petition on the grounds "of alleged irregularities and frauds, both in the registration and in the election." Id. Regarding alleged registration irregularities, the respondents contended that "the registration book, or lists, kept by the clerk, with which the [canvassing] board was required to compare the poll-lists, in order to arrive at the result," did not constitute evidence of voters' registration sufficient to satisfy the requirements of the city's charter. Id.
The circuit court granted Slaughter's petition for a writ of mandamus, and the respondents appealed. The issues this Court regarded as dispositive were: (1) the "nature of the duties imposed on the [canvassing] board by the charter," and (2) "the sufficiency ... in form of the registration lists and election returns." Id.
Because the Court's discussion of the first question provides the foundation for disposition of this most relevant issue in subsequent cases, I set forth that discussion in its entirety:
"It is insisted by the appellants, that the charter conferred on them judicial, and not merely ministerial functions, in this matter. This claim is based upon the construction of section 3 of the charter, as found on page 352, of the Acts of 1872-73, and approved March 26, 1873. This section, after fixing the qualification of voters in the city election, and making registration in a book kept by the city clerk a pre-requisite, declares as follows: `That the votes' [cast for the several candidates for mayor and aldermen] `shall be returned to the existing mayor and council, whose duty it shall be, within five days after the election, to count the votes, and compare the poll-lists with the registration lists, and reject all votes cast by persons whose names do not appear registered as hereinafter provided; and to declare by publication in a newspaper published in the city of Opelika, and by posting notices in at least four public places, the name of the person having received the greatest number of registered votes for mayor, and the names of the six persons having received the greatest number of registered votes for aldermen at said election.'
"It is perfectly clear to our mind, that the duties intended to be imposed on the board by this section are ministerial, and in no sense judicialthat they are constituted mere canvassers, or supervisors of the election returns, and have no authority to exercise the judicial power of investigating or determining the validity of the election.
"This view becomes apparent by comparing the former with the present charter, by which it is superseded. A manifest change has been made in the nature and extent of the powers of the board, as regards the whole subject of municipal elections. The former charter expressly constituted the city council to be `judges of all [such] elections,' and reposed in them `full power to determine all matters in relation thereto, and ascertain the legality of votes;' and `to reject all illegal votes, and count only such as are legal;' and, in fine, to take testimony, and examine witnesses, with the view of deciding the result. These powers are fully commensurate with those possessed by judges authorized to sit and determine regular election contests.Acts 1869-70, p. 323, § 3; Echols v. The State, ex rel. Dunbar, 56 Ala. 131. Why did the legislature abrogate these powers, which were so clearly expressed, and substitute for them the one simple duty of counting the votes, and declaring the result from a *1245 mere comparison of the registration and poll-lists? Can we convict them of doing a useless thing, by which they meant nothing, leaving out of view other potent facts disclosing an obvious intention to the contrary? That the duties of the board, furthermore, are ministerial, is plain from the additional fact, that the charter declares the board to be guilty of a misdemeanor, and punishable criminally, by fine and imprisonment, for failing or refusing to discharge these duties, as required.Acts 1872-73, p. 354, § 4. It is not customary to punish any officer for failure or refusal to discharge a judicial duty, as the discretion devolved carries with it the right to determine whether to perform or not to perform in each adjudged case. Nor can it be supposed, either, that the charter would require the respondents to count and declare the result within so brief a space as five days after the election, if the intention was to authorize an investigation of irregularities or frauds, other than such as appear on the face of the returns and papers before them. The legislative intention is further evinced in this matter by an express provision, declaring that the judge of probate shall have jurisdiction of all proceedings inaugurated for the purpose of contesting such elections, and that the issues formed shall be tried by a jury of disinterested personsthus reposing elsewhere a power taken away by the new charter from the municipal board.Acts 1872-73, § 10, p. 355.
"It is noticeable, also, that the respondents are designated in section 10 of the charter, as a `board of supervisors.' The ordinary duties of such officers are universally recognized as being purely ministerial. They are simply to make a correct statement of the votes cast for each candidate, from the face of the returns, and to ascertain by arithmetical computation who has the majority, and so to certify, or declare, as the statute may require.Code 1876, §§ 291-2. It is settled, without controversy, that mere canvassers possess no judicial or discretionary powers, and cannot go behind the returns.High on Extr. Rem. §§ 60-63; McCrary on Elections, §§ 83-84; Brightly's Elec. Cases, p. 306, note; State ex rel. [Spence] v. Judge of 9th [Judicial] Circuit, 13 Ala. 805; State, ex rel. Thompson v. Circuit Judge, 9 Ala. 338; Cooley on Const. Lim. 621, 784; Moses on Mandamus, p. 90; Kisler v. Cameron, 39 Ind. 488; State [ex rel. Attorney General] v. Steers, 44 Mo. 223; Clark v. McKenzie, 7 Bush (70 Ky.) 523.
"It is true that boards of supervisors, or canvassers, must of necessity determine, as a preliminary question, whether the returns before them, which they are required to cast up, are `genuine and intelligible, and substantially authenticated as required by law'or, in other words, whether such documents are in fact returns or notand the power thus to determine is often said to be in its nature quasi-judicial.High on Extr. Rem. § 56; McCrary on Elec. §§ 331, 82-83; People v. Head, 25 Ill. 328 [325]. Yet it must always be for the courts to determine, in each given case, whether there is any scope for the operation of this principle, and whether it be bona fide invoked.

"It is well settled, however, that in a proceeding by mandamus, to compel a board of canvassers to perform their official duties, they can not set up irregularities in the returns, or frauds in the conduct of the election, however gross or monstrous in their character. These are not matters for the considerations of courts, in applications of this kind, at least where another forum has been provided for the contest of the election, by which a complete and adequate remedy is furnished. High on Extr. Rem. § 56; McCrary on Elec. § 331; State v. Jones, 19 Ind. 356 [81 Am.Dec. 403]; People v. Head, 25 Ill. 328 [325]; Brightly's Elec. Cases, p. 306, note. The basis of the principle lies in the fact, that a canvassing board has no power to discard or reject returns of votes, which on their face appear genuine and regular in form, on the ground of frauds committed in the election. Lewis v. Commissioners, 22 Am. Rep. 275, s.c., 16 Kan. 102; Kisler v. Cameron, 39 Ind. 488, supra. In the case of the Attorney-General v. Barstow, 4 Wis. *1246 749 [567], it was said by the court, that canvassing officers were authorized only `to add up and certify by calculation the number of votes given for any office;' and it was added, that `they have no discretion to hear and take proof as to frauds, even if morally certain that monstrous frauds have been perpetrated.'
"That the writ of mandamus will be awarded to compel the discharge of such of these duties as are merely ministerial, is uniformly admitted by all the authorities.Moses on Mandamus, p. 90, and cases above cited; High on Extr. Rem. § 56."
70 Ala. at 549-52 (emphasis added).
The Court's conclusion that counting ballots and canvassing returns were "ministerial," rather than "judicial" duties, presaged the disposition of the second issue, namely, the sufficiency of the registration materials, or, more specifically, the canvassing board's role in assessing such sufficiency. In this connection, the Court hypothesized that extraordinary circumstances might justify the canvassing board's refusal to process the returns, such as, the absence of any "registration whatever." 70 Ala. at 553. In such a case, the Court suggested, an election might be "absolutely void." Id.
The Court, however, found no such circumstances present in Hudmon, for, having examined the registration book, the formal sufficiency of which was challenged, the Court concluded that it "constitut[ed], on the face of it, sufficient evidence of a substantial registration as required by the charter." Id. at 553 (emphasis added). The Court reiterated: "Canvassers ... have no authority to go behind the face of the returns ... before them, in order to adjudge questions of either irregularity or fraud. They can only reject such returns as are void on their face, as being so destitute of essential form as to render them unintelligible." Id. (emphasis added). Deeming the challenged registration materials to be "sufficiently intelligible, and in due form, to enable the respondents to count the votes and compare the poll-lists with them," id., the Court affirmed the circuit court's judgment awarding extraordinary relief.
Similarly, in Ex parte Pollard, 251 Ala. 309, 37 So.2d 178 (1948), this Court considered whether Ala.Code 1940, Tit. 17, § 235, the predecessor of § 17-15-6, deprived the Marion County Circuit Court of jurisdiction over a dispute involving the results of a primary election for a position on the Marion County Board of Revenue. 251 Ala. at 310, 37 So.2d at 179. That case arose out of a dispute involving Ben Henson and Henry Pollard for the Democratic Party's nomination, after three primaries had failed to produce an undisputed nomination. 251 Ala. at 313, 37 So.2d at 181-82. The failure of the first primary to produce a majority for either candidate had necessitated a second primary, the results of which precipitated an election contest. The "Marion County Democratic Executive Committee" ordered a third primary, after it failed conclusively to adjudicate the contest of the second primary. 251 Ala. at 310, 37 So.2d at 179.
After the third primary, "the returns ... were canvassed and it was publicly proclaimed that Henson had received a majority of the votes cast." 251 Ala. at 311, 37 So.2d at 180. Nevertheless, the executive committee certified Pollard as the party's nominee, concluding that Henson had failed to pay a "qualification fee," which, it declared, was necessary for entry in the third primary. 251 Ala. at 311, 37 So.2d at 180. Henson then petitioned the circuit court for a writ of mandamus directing the committee chairman to certify him as the nominee. 251 Ala. at 313, 37 So.2d at 181. The circuit court assumed jurisdiction of the dispute, and, while Henson's petition was pending therein, Pollard petitioned this Court for a writ of prohibition "restraining [the court] from ... proceeding in the matter." 251 Ala. at 310, 37 So.2d at 179.
This Court denied Pollard's petition. It acknowledged that the "county executive committee" of the party conducting the primary was invested with jurisdiction over primary election contests, and was empowered to sit for that purpose as a "judicial or quasi judicial body." 251 Ala. at 313, 37 So.2d at 182. It observed, however: "[W]e are not here dealing with an election contest." 251 Ala. at 313, 37 So.2d at 182 (emphasis added). *1247 The Court explained: "The executive committee in canvassing and tabulating the returns and declaring the result thereof, and the chairman in certifying the name of the nominee to the probate judge under the provisions of [Ala.Code 1940, Tit. 17, § 366, superseded by § 17-16-36],[5] exercise a purely ministerial duty. These duties are in no sense judicial." 251 Ala. at 313, 37 So.2d at 182 (emphasis added). The Court further explained that in performing these functions, the "`canvassing board has no power to discard or reject returns of votes, which on their face appear genuine and regular in form.'" 251 Ala. at 313, 37 So.2d at 182 (quoting Hudmon v. Slaughter, 70 Ala. 546, 551 (1881)) (emphasis added). This rule applies, the Court added, even if the executive committee is "`morally certain that monstrous frauds have been perpetrated.'" 251 Ala. at 313, 37 So.2d at 182 (quoting Hudmon, 70 Ala. at 552). Consequently, it concluded that Tit. 17, § 235, did not deprive the circuit court of jurisdiction to issue its writ of mandamus requiring the chairman of the executive committee to perform nondiscretionary duties, namely, to certify Henson as the Democratic Party's nominee. 251 Ala. at 314, 37 So.2d at 182.
Less than five years after Pollard was decided, this Court reaffirmed the rule, as follows:
"Canvassing the returns of an election is a ministerial act, and when it is completed and the results declared an unsuccessful candidate may contest the election....
"The canvassers are controlled by the returns of the inspectors and have no power to go behind them or inquire into fraud or irregularity, but they must add together the number of votes each candidate received in the several voting precincts, according to the certificates of the inspectors, and declare the result; and are subject to mandamus to compel a performance when necessary. Their duties are confined to computation."
Cosby v. Moore, 259 Ala. 41, 46, 65 So.2d 178, 181-82 (1953) (emphasis added).
More recently, this Court revisited § 17-5-6 and reexamined its sphere of operation in an action initiated to compel election officials to count votes and declare a result. Sears v. Carson, 551 So.2d 1054 (Ala.1989), involved an election for the office of Franklin, Alabama, town council. The details of the dispute were set forth in Sears as follows:
"[David] Sears and Gibson were on the ballot for the Tuesday, August 23, 1988, election to the Franklin town council. Appellee Gibson was the incumbent town council member. After the polling had ended, the election officials prepared a statement of canvass to deliver to the Franklin town council (which also serves as the canvassing board). The statement said that Sears had received 44 votes (32 by machine, 8 by challenged ballot, and 4 by absentee ballot) and that Gibson had received 38 votes (33 by machine, 2 by challenged ballot, and 3 by absentee ballot). The results were posted, but the canvassing board did not meet by noon August 24, 1988, as required by Code 1975, § 11-46-55 (cum.supp.1988).[6] On August 26, 1988, *1248 appellant Sears obtained a writ of mandamus from the Macon County Circuit Court that ordered the board to count the votes and declare a winner by August 29, 1988, at 7:00 p.m. That same day, the board met and threw out all of the votes but the machine votes and declared Gibson the winner by a vote of 33-32. Sears filed another petition for writ of mandamus; the circuit court denied it, but, on reconsideration, amended its original order of mandamus to require the board to count all the votes (including absentee and challenged votes) by September 28, 1988. The Council recanvassed the votes on September 27, 1988. Sears was declared the winner, and the Council issued Sears a certificate of election.... On September 30, 1988, Gibson filed an election contest."
Sears, 551 So.2d at 1055-56.
On appeal of the judgment granting Sears's petition, the canvassing board contended that "§ 17-15-6 deprive[d] the circuit court of jurisdiction over the case and, as a result, prevent[ed] this Court from exercising jurisdiction." 551 So.2d at 1056. We rejected that contention, explaining that the duties imposed by § 11-46-55(a) required the canvassing board "not to determine if the election was fraudulent or fair, but merely to count the votes and declare the winner." 551 So.2d at 1056. Quoting Cosby v. Moore, 259 Ala. 41, 46, 65 So.2d 178, 181-82 (1953), we characterized that duty as a "`ministerial act,'" and determined that "[b]y failing to verify the results of the election, the board [had] assumed a new role never intended by the legislature." We reasoned that to permit the statute "to stand between the judiciary and such acts" would authorize "any canvassing board ... to change the results of an election by cabal." 551 So.2d at 1056 (emphasis added). Concluding that "[t]he purpose and intent of § 17-15-6 were not to undermine the sanctity of the individual vote," 551 So.2d at 1056, we held that the statute did not deprive the circuit court of power to compel the canvassing board to count the votes and "declare the winner." 551 So.2d at 1056.
These cases dispel any doubt that the Montgomery County Circuit Court possessed the power to compel election officials and the Secretary of State (hereinafter collectively designated "Secretary") to count the contested ballots, canvass returns, and certify the results of the election in this case. The counting of votes for the offices of Chief Justice and State Treasurer is regulated by Ala. Const. 1901, art. VIII, § 193; and Ala. Code 1975, §§ 17-13-1 to -11; the canvassing of returns for those offices is regulated by Ala.Code 1975, §§ 17-14-20 to -27. The following summaries typify the duties designated in chapter 13: (1) counting ballots, §§ 17-13-1 to -2; (2) identifying boxes, § 17-13-3; (3) labelling ballots and sealing packages, § 17-13-4; (4) sealing and delivering poll lists and votes, § 17-13-6; (5) certifying votes and filing certificates, § 17-13-7; (6) posting certificates of results, § 17-13-8; (7) sealing and delivering certificates of results, § 17-13-10; and (8) making and delivering copies of certificates, § 17-13-11. The following summaries typify the duties designated in the applicable sections of chapter 14: (1) opening and counting election returns, § 17-14-20; (2) publishing results, § 17-14-21; (3) forwarding certificates, § 17-14-21; (4) filing voter lists, § 17-14-23; and (5) filing certificates, § 17-14-24. A thorough search of these sections fails to reveal a single provision that invests the Secretary with authority different in any relevant respect from the authority invested in the election officials involved in Hudmon, Pollard, and Sears. In other words, the acts designated in chapters 13 and 14, such as, (1) *1249 opening, (2) counting, (3) identifying, (4) labelling, (5) sealing, (6) delivering, (7) certifying, (8) posting, (9) filing, (10) publishing, and (11) forwarding, are not different in character than the (1) "counting," (2) "comparing," (3) "posting," and (4) "publishing" required in Hudmon; the (1) "canvassing," (2) "tabulating," (3) "certifying," and (4) "declaring" required in Pollard; or the (1) "canvassing" and (2) "determining" required in Sears.
Moreover, § 17-13-6 and § 17-14-26 both penalize officials for failure to perform the duties prescribed in chapters 13 and 14, respectively. Specifically, § 17-13-6 provides in pertinent part: "Any returning officer of the precinct who fails to deliver the statement of votes and poll list to the returning officer of the county, within [48 hours after the election], must, on conviction, be fined..., and must also be imprisoned ..." (emphasis added). Section 17-14-26 provides in part: "If any officer required to make returns of any election to the Secretary of State or to the Speaker of the House of Representatives fails to make such returns within the time prescribed, he forfeits to the state $500.00...." These penalty provisionswhich appear, both in chapter 13 and in chapter 14refute the notion that provisions in either chapter authorize the Secretary of State to exercise discretion in processing election returns. Hudmon, 70 Ala. at 550 ("It is not customary to punish any officer for failure or refusal to discharge a judicial duty, as the discretion devolved carries with it the right to determine whether to perform or not to perform in each ... case.").
These considerations demonstrate that the performance demanded by the Montgomery County Circuit Court, namely, the counting of absentee ballots, was purely ministerial. The sufficiency vel non of the contested affidavits wasunder the bright-line test set forth in Williams v. Lide, 628 So.2d 531 (Ala.1993)facially apparent. Otherwise stated, it is the joint convention, not the Secretary of State, that the legislature has authorized to "inquire into fraud or irregularity," see Cosby v. Moore, 259 Ala. 41, 46, 65 So.2d 178, 182 (1953), and this inquiry must proceed in strict compliance with §§ 17-15-50 to -63, authorizing and regulating election contests for the offices involved in this case.
The statutes applicable at this stage merely bind the Secretary, in conjunction with the Williams affidavit test, perfunctorily to count, canvass, and certify all absentee votes accompanied by the voter's (1) signature, (2) address, and (3) reason for using an absentee ballot. In discounting ballots that were facially sufficient, the Secretary not only acted under a mistaken interpretation of the law, but also assumed a role never heretofore authorized by our legislature. Thus, to construe § 17-15-6 so broadly as to deny jurisdiction under facts such as these would enable the Secretary to control election results by fiat, and, consequently, would circumvent the integrated system the legislature has prescribed specifically for contesting elections. 551 So.2d at 1056. A construction that permits the exercise of jurisdiction in cases such as Hudmon, Pollard, Sears, and this one, is thus the only construction under which a practical effectuation of the provisions of chapter 15 is possible.
Also not to be overlooked is the fact that the provisions of § 17-15-6 have been carried forward without relevant change in every code compilation since their first codification in 1876. See Ala.Code 1876, § 314; Ala.Code 1886, § 407; Ala.Code 1896, § 1671; Ala.Code 1907, § 459; Ala.Code 1923, § 549; Ala.Code 1940 Tit. 17, § 235; Ala.Code 1940, Tit. 17, § 235 (Recomp.1958). This judicial construction, which has been applied consistently throughout the statute's history, is, consequently, deemed to have "become a part of [the statute] by legislative adoption." Spooney v. State, 217 Ala. 219, 221, 115 So. 308, 310 (1928); see also Campbell v. Williams, 638 So.2d 804 (Ala.1994); Edgehill Corp. v. Hutchens, 282 Ala. 492, 213 So.2d 225 (1968); Sloss Sheffield Steel & Iron Co. v. Nations, 243 Ala. 107, 8 So.2d 833 (1942). Indeed, "[l]egislative adoption is presumed conclusive when repeated reenactments follow a notorious practical interpretation." 2B N. Singer, Sutherland Statutory Construction § 49.09 (5th ed. 1992) (emphasis added). Thus, the Montgomery County Circuit Court's exercise of jurisdiction to compel the Secretary to perform the ministerial *1250 tasks of counting ballots and certifying the returns of the November 8, 1994, electionbeing consistent with § 17-15-6 and long-established case lawwas proper.

DISSENTING OPINION
MADDOX, Justice (dissenting) [opinion issued March 14, 1995].
The United States Court of Appeals for the Eleventh Circuit, pursuant to the provisions of Rule 18, Ala.R.App.P., has asked us whether absentee ballots that, on the accompanying affidavit envelope, fail to have the signatures of two witnesses over 18 years of age or that of a notary public or other officer authorized to acknowledge oaths, substantially complies with the requirements of Alabama law, specifically Ala.Code 1975, § 17-10-7.[1]
The majority has included the specific question certified to us by the Eleventh Circuit, but I include it in my dissent also:
"CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT TO THE SUPREME COURT OF ALABAMA PURSUANT TO RULE 18 OF THE ALABAMA RULES OF APPELLATE PROCEDURE.
"TO THE SUPREME COURT OF ALABAMA AND ITS HONORABLE JUSTICES:
"It appears to the United States Court of Appeals for the Eleventh Circuit that this case involves a question of Alabama state law that is determinative of the cause, but unanswered by controlling precedent of the Supreme Court of Alabama or any Alabama Court of Appeals. We therefore certify this question for resolution by the highest court of Alabama:
"WHETHER ABSENTEE BALLOTS THAT, ON THE ACCOMPANYING AFFIDAVIT ENVELOPE, FAIL TO HAVE TWO WITNESSES AND LACK PROPER NOTARIZATION (FOR EXAMPLE, BALLOT ENVELOPES THAT HAVE ONLY A SIGNATURE OR ONLY ONE WITNESS, OR ON WHICH THE VOTER AND THE NOTARY HAVE SIGNED THE BALLOT BUT THE NOTARY FAILS TO FILL IN THE `TITLE OF OFFICIAL') MEET THE REQUIREMENTS OF ALABAMA LAW, SPECIFICALLY ALABAMA CODE SECTION 17-10-7, TO BE LEGAL BALLOTS DUE TO BE COUNTED IN THE NOVEMBER 8, 1994 GENERAL ELECTION."
It is interesting to note that the Eleventh Circuit, even though aware of this Court's decisions in Wells v. Ellis, 551 So.2d 382 (Ala.1989), and Williams v. Lide, 628 So.2d 531 (Ala.1993), nevertheless determined that the question presented was "unanswered by controlling precedent of the Supreme Court of Alabama or any Alabama Court of Appeals." I agree with the Eleventh Circuit that Wells v. Ellis and Williams v. Lide did not address specifically the question posed in this certification.[2]
*1251 Neither Wells v. Ellis nor Williams v. Lide stands for the proposition that an absentee ballot should be counted whether it is properly witnessed or not. In fact, the rule of law stated in Wells v. Ellis is that an absentee ballot should be counted only if it complied with the "the essential requirements of the absentee voting law," and Williams v. Lide did not address the issue certified to us by the Eleventh Circuit.
In certifying the question to us, the Circuit Court of Appeals for the Eleventh Circuit wrote a lengthy opinion, in which that Court set out many of the facts surrounding this controversy, and in which that Court listed and commented upon much of the applicable Alabama law.
It is apparent to me from a reading of the Eleventh Circuit Court's opinion that the Court is familiar with the historical facts of this action, and of the serious questions of Federal Constitutional law created when the circuit court, in Odom v. Bennett, No. 94-2434-R (Montgomery County Cir.Ct., filed Nov. 16, 1994), accepted jurisdiction of the complaint and issued an injunction directing the counting of absentee ballots that clearly did not substantially comply with the essential requirements of Alabama's election laws.
The Eleventh Circuit Court of Appeals could have decided the Federal Constitutional claims presented to it without showing any deference to this Court, but that Court, even though recognizing that "time [was] of essence," did defer to this Court. In deferring to this Court, the Eleventh Circuit Court said:
"There are two ways to show deference to the state decisionmakers in this matter: we can leave the plaintiffs to their state remedies; or we can certify a question to the Supreme Court of Alabama, retain jurisdiction, and await that court's answer. We choose the latter form of abstention; leaving the plaintiffs to their state remedies is neither workable nor appropriate in this case.
"Because Alabama has barred its courts from entertaining statewide election contests, see Ala.Code § 17-15-6 (quoted supra note 4), there is only one state remedy in this case: a contest in the legislature. The legislature, however, is not an adequate or proper forum for the resolution of the federal constitutional issues presented. Moreover, even if the plaintiffs were to intervene successfully in the Montgomery County Circuit Court proceeding, Odom v. Bennett, and the Alabama appellate courts were to finddespite the clear jurisdictional barthat the circuit court had the power to hear the plaintiffs' constitutional claims, the urgency of this matter counsels against such a course of action. The unnecessary delay that would result were we to leave the plaintiffs to their state court remedy would be particularly insidious: it would extend the time that the two offices at issue remain in limbo, hindering those offices in the handling of state affairs. Time is, therefore, of the essence. Cf. Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965) (holding that a district court did not abuse its discretion in refusing to abstain "[g]iven the importance and immediacy of the problem[] and the delay inherent in referring questions of state law to state tribunals"); Badham v. United States Dist. Court, 721 F.2d 1170, 1173 (9th Cir.1983) ("Although we are mindful of the important principles of federalism implicit in the doctrine of abstention, these principles may be outweighed in an individual case by the countervailing interest in ensuring each citizen's federal right to vote.").
"By certifying the question to the Supreme Court of Alabama, we can accommodate Alabama's interest in having its high court settle the question whether a notarization or the signatures of two witnesses is required before an absentee ballot may be counted. Certification will achieve the proper balance between the interest of federalism and timely resolution of this matter."
I have carefully read the briefs of the parties upon which this case is submitted, and I have *1252 also studied the opinion of the Eleventh Circuit Court of Appeals, and other facts that I consider pertinent and necessary to answer the question posed.
Based upon my understanding of the law of Alabama and the law generally applied in other jurisdictions as it relates to absentee balloting, I conclude, as follows:
(1) Under Alabama law, specifically Ala. Code 1975, § 17-10-7, an absentee ballot must be accompanied by an "affidavit," and the signature of the voter on the "affidavit" must be witnessed by either a notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older.
(2) Under Alabama law, an absentee ballot should not be counted unless the affidavit substantially complies with the essential requirements of the absentee voting law; and one of the essential requirements of Alabama law is that the absentee ballot should be accompanied by an "affidavit." A voter's signature that is not witnessed by either a notary public or other officer authorized to administer oaths, or by two witnesses 18 years of age or older is not a legal "affidavit."
(3) An absentee ballot should not be counted if the irregularity in the affidavit would adversely affect the sanctity of the ballot and the integrity of the election. Wells v. Ellis, 551 So.2d 382, 383 (Ala.1989).[3]
The majority states that Williams v. Lide held that an absentee ballot should be counted even though the voter's signature on the affidavit was neither witnessed by a notary public or by two witnesses.
I participated in both Wells v. Ellis and Williams v. Lide, and I can say, with assurance, that neither of those cases holds that an absentee ballot should be counted if the voter's signature is not properly witnessed. Wells v. Ellis[4] involved an election contest and this Court granted an appeal by permission and decided a legal question onlywhether Alabama would adopt a "substantial compliance" test or a "strict compliance" test. This Court elected to adopt the substantial compliance rule from a Florida case, Boardman v. Esteva, 323 So.2d 259 (Fla.1975), and set out that rule as follows:
"`(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
"`(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
"`(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.'"
"Bolden v. Potter, 452 So.2d 564, 566 (Fla. 1984). See, also, Brown v. Grzeskowiak, 230 Ind. 110, 101 N.E.2d 639 (1951)." (Emphasis added).
Wells v. Ellis, 551 So.2d 382, 383 (Ala.1989).
In Wells v. Ellis, this Court, after setting out the above quoted rule, said that "[w]e find the Boardman rationale to be the correct one for resolving absentee voting statute disputes and, therefore, we adopt the law set out in that decision as it relates to the construction of Ala.Code 1975, § 17-10-4 et seq."
I have gone to the record in Williams v. Lide, and I have copies of the actual affidavits that were in dispute in that case. A reading of the facts of Williams v. Lide affirmatively shows that this Court affirmed the trial court's rejection of Williams' claim that the ballots of convicted felons should be counted, and this Court also affirmed the trial court's rejection of two absentee ballots that the trial judge found did not substantially *1253 comply with the law. Although this Court, in Wells v. Ellis, adopted the "substantial compliance" rule rather than the "strict compliance" rule, this Court did not adopt a rule that would abrogate the requirement of the law, stated on the absentee form itself that "[the voter's] signature must be witnessed by either: A notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older." The requirement that the ballot have an "affidavit" containing the signature of a notary public or other officer authorized to administer oaths or by two witnesses over the age of 18 years is not a "technical" requirement as set out in Wells v. Ellis, but is an "essential requirement" that relates to the sanctity of the ballot itself, a prong of the "substantial compliance" test set out in Wells v. Ellis. Although I agree that a technical failure to comply with a "technical" requirement of the absentee voting law should not invalidate a ballot, I have never voted to agree with an interpretation of Alabama law that would eliminate compliance with the "essential requirements of the absentee voting law," the language used in Wells v. Ellis.[5]
I have done substantial research on this question and I fail to locate a single case from any other jurisdiction, where the absentee election laws require an affidavit or other form of certification of the voter's signature, that this requirement of an "affidavit" or other form of certification can be satisfied if there are no attesting signatures.[6]
It seems clear to me that Alabama law states that an absentee ballot must be accompanied by an "affidavit," which is one of the "essential requirements" of the law, and the failure of an absentee ballot to be accompanied with a proper affidavit could obviously "adversely affect the sanctity of the ballot and the integrity of the election," and each of the federal judges who have considered the rule in Wells v. Ellis and Williams v. Lide seem to agree with my interpretation of those two cases.
Based on the foregoing, I am of the opinion that, under Alabama law, specifically Ala. Code 1975, § 17-10-7, an absentee ballot must be accompanied by an "affidavit," and the signature of the voter on the "affidavit" must be witnessed by either a notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older, which is an essential requirement of the absentee ballot law.
Because of the importance of the issues presented, and because there are still pending Federal Constitutional issues presented to the Eleventh Circuit, I state in some detail the reasons I draw the conclusions that I do.

I
Under Alabama law, specifically Ala. Code 1975, § 17-10-7, an absentee ballot must be accompanied by an "affidavit," and the signature of the voter on the "affidavit" must be witnessed by either a notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older.
I can only begin this portion of my dissent by saying that the provisions of Alabama law are quite specific and clear regarding the requirement of an "affidavit," and the dispute is over what this Court either said or did not say in two cases: Wells v. Ellis, 551 So.2d 382, 383 (Ala.1989), and Williams v. Lide, 628 So.2d 531, 536 (Ala.1993). As I have stated above, the specific question presented here was not presented in either of those cases. As I stated earlier, I participated in both of those cases.
What was the rationale of Boardman that is followed in Wells? As I read the Boardman case, the Florida court balanced the interests of the voters, the candidates, and the Florida legislature, but the Court, as I view it, did not hold that essential provisions contained in Florida's absentee voting statute were of no effect in determining the validity of absentee ballots. The Florida Court, in Boardman, was very clear on this. See the discussion in Boardman, 323 So.2d at page 265, concerning the Florida requirement that the "application for absentee *1254 elector's ballot" be properly executed and placed in an envelope separate from the absentee ballot. See, also, footnote 1, 323 So.2d at pages 263-64, wherein the Court, although not specifically stating that the oath was an essential part of the statute, nonetheless suggested that it was the intent of the Florida legislature to require the execution of an oath in "substantially" the same form prescribed in the statute, which is exactly what the Alabama legislature has done in Ala.Code 1975, § 17-10-7, with respect to the required oath.
In the Boardman case, the Court framed the issue in that case, as follows:
"At issue is whether the absentee voting law requires absolute strict compliance with all its provisions, or whether substantial compliance is sufficient to give validity to the ballot."
323 So.2d at 262.
In my view, the basic holding of the Florida Court in Boardman can be gleaned from the portions of 323 So.2d at pages 263, 265 and 269 of 323 So.2d. I would paraphrase the holding, in Boardman as follows:
In the absence of proof of fraud, gross negligence, or intentional wrongdoing on the part of the voters or the election officials, "technically" defective absentee ballots should not be discounted unless "the sanctity of the ballot and the integrity of the election were not maintained." (p. 263) Provisions contained in the absentee voting statute that the legislature considers to be "essential" to the validity of the ballot and, thus, to the preservation of the integrity of the election process, are to be construed as mandatory and given effect in accordance with legislative intent. (p. 265) Provisions contained in the absentee voting statute that are not necessarily deemed by the legislature to be "essential" to the validity of the ballot are to be construed as directory, provided that even a violation of such a directory provision is fatal to the validity of an absentee ballot if the violation could affect the integrity of the ballot or the election. (p. 265)

II
The rules of statutory construction compel an Interpretation of Alabama's Absentee Election Laws Require Ballots which are not accompanied by a proper affidavit to be Excluded.
What rule of statutory construction should we apply? This Court has previously been asked to construe a State statute by a Federal Court, and in that case, this Court set out the rules that govern our construction. In John Deere Co. v. Gamble, 523 So.2d 95, 99-100 (Ala.1988), this Court said:
"`The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Advertiser v. Hobbie, 474 So.2d 93 (Ala.1975); League of Women Voters v. Renfro, 292 Ala. 128, 290 So.2d 167 (1974). If possible, the intent of the legislature should be gathered from the language of the statute itself. Advertiser v. Hobbie, supra; Morgan County Board of Education v. Alabama Public School and College Authority, 362 So.2d 850 (Ala. 1978)....'
"Clark v. Houston County Comm'n, 507 So.2d 902, 903-04 (Ala.1987)."
Ala.Code 1975, § 17-10-7, which this Court is asked to construe here, provides:
"Each absentee ballot shall be accompanied by an envelope upon which shall be printed an affidavit. This affidavit which shall be used in general, special or municipal elections shall be substantially as follows:
"`State of Alabama
"`County of....................
"I, the undersigned, do swear (or affirm)
that:
"`(1) I am a resident of ..........
county in the state of Alabama.
"`(2) My place of residence in Alabama
is:
....................................
 (street)
............. Alabama ............
 (city or town) (zip code)
"`(3) My voting precinct (or place
where I vote) is:...................
....................................
"`(4) My date of birth is...........
....................................
month day year
*1255
"`(5) I am entitled to vote an absentee
ballot because:
"Check only one:
________ I have moved from Alabama
less than thirty days prior to the
election.
_________I will be out of the county
or the state on election day.
_________I am physically incapacitated
and will not be able to vote in
person on election day.
`"I further swear (or affirm) that I have not voted nor will I vote in person in the election to which this ballot pertains.
"`I have marked the enclosed absentee ballot voluntarily and that I have read or had read to me and understand the instructions accompanying this ballot and that I have carefully complied with such instructions.
"`Moreover, I further swear (or affirm) that all of the information given above is true and correct to the best of my knowledge and that I understand that by knowingly giving false information so as to vote illegally by absentee ballot that I shall be guilty of a misdemeanor which is punishable by a fine not to exceed $1,000.00 and/or confinement in the county jail for not more than six months.
 ............................
 (Signature or mark of voter)
"`Note: Your signature must be witnessed by either: A notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older.
"`Sworn to and subscribed before me this.... day of.............., 19 .... I certify that the affiant is known (or made known) to me to be the identical party he claims to be.
.................... (Signature of official)
(Title of official)
.....................
(Address of official)
 OR
"1st Witness ..............................
 Signature
 ......................
 Print name
 ......................
 Address
 ......................
 City Zip Code
"`2nd Witness .............................
 Signature
 .......................
 Print name
 .......................
 Address
 .......................
 City Zip Code'"
Alabama Code 1975, § 17-10-9 provides:
"After marking the ballot and subscribing the oath herein required, the voter shall seal his ballot in the plain white envelope, place that plain white envelope inside the affidavit envelope, complete the affidavit, and shall forward it by United States Mail to the addressee or shall hand it to him in person."
The operative words in the first two sentences of § 17-10-7 are "affidavit" and "shall be." The Legislature has specifically provided that an absentee ballot "shall be" accompanied by an envelope upon which "shall be" printed an affidavit. The affidavit which "shall be" used in elections "shall be" substantially as the form set out in § 17-10-7.
"The word `shall,' when used in a statute, usually indicates that the requirement is mandatory. Prince v. Hunter, 388 So.2d 546, 548 (Ala.1980)." Ex parte Brasher, 555 So.2d 192, 194 (Ala.1989). There are exceptions, of course, when "shall" is interpreted as directory. If it is obvious that the Legislature intended "shall" to be permissive or where the validity of the statute is placed in jeopardy, the word "shall" is interpreted as directory. Prince v. Hunter, 388 So.2d at 548. Neither of these exceptions is present in the instant case. When the statutory provision does not relate to the essence of the thing to be done and as to which compliance is a matter of convenience rather than substance, then "shall" can be interpreted as directory; Rodgers v. Meredith, 274 Ala. 179, 146 So.2d 308 (1962); but when the provision of a statute is the essence of the thing to be done, it is mandatory. Mobile County Republican Executive Committee v. Mandeville, 363 So.2d 754, 757 (Ala.1978). In the first two sentences of § 17-10-7, the affidavit is the essence of the thing to be done: "Each absentee ballot shall be accompanied by an envelope upon which shall be printed an affidavit. This affidavit which shall be used in general ... elections shall be substantially as *1256 follows...." (Emphasis added). It is mandatory that there be an affidavit; and § 17-10-9 requires that the affidavit must be completed ("the voter shall ... complete the affidavit").
Although there is no definition of the word "affidavit" in the Alabama Code insofar as I can tell, the word is used in many statutes, among them are Ala.Code 1975, § 15-5-3 ("A search warrant can only be issued on probable cause, supported by an affidavit...."); § 35-9-35 (a landlord before attaching tenant's property to enforce landlord's lien must make affidavit); § 5-19-11 ("No creditor ... shall bring an action on any debt for collection, and no judgment by default or otherwise shall be entered until the creditor shall file an affidavit stating."); § 6-6-391 ("To obtain such writ of garnishment, the plaintiff... must make, before an officer authorized to administer oaths ... an affidavit...."); § 12-2-3 ("The chief justice and every associate justice of the Supreme Court of Alabama may administer oaths and take any affidavits or acknowledgements authorized or required by law."); § 12-21-4 ("Affidavits required in the commencement or progress of any action or judicial proceeding can be taken without this state before any commissioner appointed by the governor et al...."); § 22-19-61 (An anatomical gift shall be made by the execution of a sworn affidavit filed with the department of public safety. "The affidavit shall be signed by the holder of the driver's license or nondriver identification card in the presence of two witnesses who shall acknowledge the affidavit in the presence of the donor.")
The word "affidavit" is defined as follows:
"A written or printed declaration or statement of facts made voluntarily, and confirmed by the oath or affirmation of the party making it, taken before a person having authority to administer such oath or affirmation."
(Emphasis added). Black's Law Dictionary 58 (6th ed. 1990).
"[A] sworn statement in writing made esp. under oath or on affirmation before an authorized magistrate or officer...."
(Emphasis added.) Webster's Third New International Dictionary 35 (Unabridged 1976).
"A declaration upon oath. In the United States, more generally, a declaration in writing, signed by the party, and sworn to before an authorized magistrate." (Emphasis added.) Noah Webster's First Edition of An American Dictionary of the English Language (1828) (pages are not numbered).
"A voluntary sworn declaration in writing made before competent authority."
(Emphasis added.) 1 Funk & Wagnall's New Comprehensive International Dictionary of the English Language 24 (1982).
"Law. A written declaration made under oath before a notary public or other authorized officer."
(Emphasis added.) The American Heritage Dictionary 22 (1969).
"Law. A written declaration upon oath made before an authorized official."
(Emphasis added.) The Random House Dictionary of the English Language 24 (1966).
"Law. A written declaration made under oath before a notary public or other officer."
(Emphasis added.) The American Heritage Dictionary 84 (Second College Edition 1982).
"[A] sworn statement in writing made esp. under oath or on affirmation before an authorized magistrate or officer."
(Emphasis added.) Webster's New Collegiate Dictionary 20 (1981).
The requirement of an affidavit is strengthened by the following, which appears in § 17-10-7 after the line on which the absentee voter is to place his/her signature or mark: "Note: Your signature must be witnessed by either: A notary public or other official authorized to acknowledge oaths or two witnesses 18 years of age or older." (Emphasis added.)
The word, "must," is regarded as mandatory in meaning. Ex parte Stephens, 259 Ala. 361, 363, 66 So.2d 901, 902-03 (1953).
The meaning of the word "must" is explained in 64 C.J.S. 1080 as follows:

*1257 "MUST. The word `must' means obliged; to be obliged; to be legally or morally obliged to do a given thing; to be necessary; required. It creates an obligation and imposes a physical or moral necessity; and it implies obligation or compulsion.
"In ordinary parlance `must' is a word of command, compulsory in meaning, generally mandatory or imperative, and not directory or discretionary."
There is nothing to indicate that the Legislature, in using the word "must" in this statute, intended for it to have any meaning other than when used in its ordinary sense.
The form of the "affidavit" in § 17-10-7, provides, in pertinent part, as follows:
"I, the undersigned, do swear (or affirm)....
". . . .
"I further swear (or affirm)....
". . . .
"Moreover, I further swear (or affirm)...."
"Swear" is defined in Black's Law Dictionary 1448 (6th ed. 1990) as meaning:
"To take an oath; to be bound by an oath duly administered. To declare on oath the truth (of a pleading, etc.)."
"Affirm" is defined in Black's Law Dictionary 59 (6th ed. 1990) as follows:
"To make affirmation; to make a solemn and formal declaration or asseveration that an affidavit is true, that the witness will tell the truth, etc., this being substituted for an oath in certain cases. Also, to give testimony on affirmation."
Following the third oath or affirmation, there is an acknowledgement in the affidavit that false information given "so as to vote illegally by absentee ballot" is a violation of the criminal law:
"I shall be guilty of a misdemeanor which is punishable by a fine not to exceed $1,000 and/or confinement in the county jail for not more than six months."[7]
"Oath" is defined in § 13A-10-100(b)(3) as follows:
"Such term includes an affirmation and every other mode authorized by law attesting to the truth of that which is stated. For the purposes of this article, written statements shall be treated as if made under oath if:
"(a) The statement was made on or pursuant to form bearing notice, authorized by law, to the effect that false statements made therein are punishable; or
"(b) The statement recites that it was made under oath, the declarant was aware of such recitation at the time he made the statement and intended that the statement should be represented as a sworn statement, and the statement was in fact so represented by its delivery or utterance with the signed jurat of an officer authorized to administer oaths appended thereto."
Giving effect to the intent of the Legislature," I am compelled to conclude that because § 17-10-7 so clearly directs terms that the absentee voter's signature must be acknowledged by an officer authorized to take oaths or witnessed by two witnesses over the age of 18 years, it would be contrary to the intent of the legislature for this Court to adopt a construction of § 17-10-7 that would dispense with this "essential requirement" of the law, and would "adversely affect the sanctity of the ballot and the integrity of the election." Wells v. Ellis, 551 So.2d at 383.
*1258 The fundamental rule of statutory construction, the clear language of §§ 17-10-7 and 17-10-9, require me to interpret legislative intent as mandating that an absentee voter's signature must be witnessed by a notary public or other official authorized to acknowledge oaths or by two witnesses 18 years of age or older. That is an "essential requirement" of the law, not a technical requirement, and substantial compliance with that essential requirement of the law not only is mandated but is necessary to protect the sanctity of the ballot and the integrity of the election process.
I am of the opinion that the law of Alabama is clear that an absentee ballot that is not accompanied by an affidavit signed by a notary public or other officer authorized to acknowledge oaths, or by two witnesses as required by law fails to substantially comply with "the essential requirements of the absentee voting law," and such an irregularity would "adversely affect the sanctity of the ballot and the integrity of the election." Wells v. Ellis, 551 So.2d 382, 384 (Ala.1989). Consequently, I must disagree with the members of this Court who answer the question differently.

III
The Circuit Court of Montgomery County was without subject matter jurisdiction to determine whether absentee votes should or should not have been counted.
Although the Eleventh Circuit did not ask this Court whether the Circuit Court of Montgomery County had jurisdiction to determine whether the absentee votes should or should not have been counted, the Eleventh Circuit, in its opinion, did question whether the Circuit Court of Montgomery County had jurisdiction in the first place.
The elections which are the subject of this case involved state officers, and the circuit court of Montgomery County, Alabama, in Odom v. Bennett, No. 94-2434-R (November 16, 1994) assumed jurisdiction of the cause and issued an injunction ordering the counting of absentee ballots that election officials had determined had failed to substantially comply with Alabama law. It was that lawsuit that spawned the filing of an action in Ralph E. Bradford, Sr., et al. v. The State of Alabama, et al., (CV 94-PT-2816-M, United States District Court for the Northern District of Alabama, Middle Division, November 25, 1994), and the filing of this action in the United States District Court for the Southern District of Alabama.
The Eleventh Circuit Court suggests that the Montgomery County Circuit Court was without jurisdiction to decide whether certain absentee votes should or should not have been counted in this case in light of the provisions of Ala.Code 1975, § 17-15-6. I agree with the Court. Section 17-15-6 states that "[n]o jurisdiction exists in or shall be exercised by any judge, court or officer exercising chancery powers to entertain any proceeding for ascertaining the legality, conduct or results of any election, except so far as authority to do so shall be specially and specifically enumerated and set down by statute; and any injunction, process or order from any judge, court or officer in the exercise of chancery powers, whereby the results of any election are sought to be inquired into, questioned or affected ... save as may be specially and specifically enumerated and set down by statute, shall be null and void and shall not be enforced by any officer or obeyed by any officer or obeyed by any person...."[8]
*1259 The Eleventh Circuit Court also was of the opinion that the decision of the circuit court in Odom v. Bennett "failing to exclude the contested absentee ballots [would] constitute[d] a post-election departure from previous practice in Alabama." Roe v. State of Alabama et al., 43 F.3d at 581. The United States District Court, in Bradford, et al. v. The State of Alabama et al., reached the same conclusion and enjoined the order issued in Odom v. Bennett until it was pre-cleared under Section 5 of the Voting Rights Act.
In view of the fact that the Eleventh Circuit Court mentioned the jurisdictional question, I address that issue for whatever benefit it might be to the Eleventh Circuit in resolving the constitutional issues it faces.
The law seems to be clear that, under the Judicial Article to Alabama's Constitution, Amendment 328, Alabama courts can only exercise such jurisdiction as is granted to them by the Legislature and the Legislature has specifically provided that:
"No jurisdiction exists in or shall be exercised by any judge, court or officer exercising chancery powers to entertain any proceeding for ascertaining the legality, conduct or results of any election, except so far as authority to do so shall be specially and specifically enumerated and set down by statute; and any injunction, process or order from any judge, court or officer in the exercise of chancery powers, whereby the results of any election are sought to be inquired into, questioned or affected, ... save as may be specially and specifically enumerated and set down by statute, shall be null and void and shall not be enforced by any officer or obeyed by any person...." (Emphasis added.)
Ala.Code 1975, § 17-15-6.
The Legislature has further provided, in Ala.Code 1975, § 17-15-1, as follows:
"The election of any person declared elected to the office of ... treasurer, ... [or] justice[] of the supreme court ... may be contested by any person who was at the time of either of the said elections a qualified elector for any of the following causes:
". . . .
"(3) On account of illegal votes.
"(4) On account of the rejection of legal votes.
". . . ."
The two offices at issue in this State are the office of State Treasurer and the office of Chief Justice of the Supreme Court, and Alabama law specifically provides that any contest of an election involving either of those offices shall be filed with the Speaker of the Alabama House of Representatives (Ala.Code 1975, § 17-15-50) and the contest shall be tried by the two houses of the legislature in "joint convention assembled" (Ala. Code 1975, § 17-15-52). In Parker v. Mount Olive Fire & Rescue District, 420 So.2d 31, 33 (Ala.1982), this Court held that "`Elections belong to the political branch of the government, and, in absence of special constitutional or statutory provisions, are beyond the control of judicial power.' Longshore v. City of Homewood, 277 Ala. 444, 446, 171 So.2d 453 (1965) (quoting 29 C.J.S. Elections § 246)."
Even though a question could be raised whether this Court has jurisdiction to answer this certified question from a Federal court,[9] I voted to accept it because the issue before the Federal Courts involve Federal Constitutional rights which must be decided in those forums.[10]
The foregoing opinion was hurriedly prepared because the majority opinion was delivered to my office at 11 a.m. on March 14, 1995, and I had to get this dissenting opinion filed by 3 p.m. on the same date. I reserve the right to make any corrections that I might need to make in this dissenting opinion at a later date, and to write additionally should I desire.
*1260 My dissenting opinion addresses the question posed by the Eleventh Circuit. By not addressing the question of Federal jurisdiction, I should not be understood as agreeing with the views expressed in the majority opinion. I can say that my view is that the Eleventh Circuit has correctly interpreted Federal constitutional law on these issues.

OPINION DISSENTING FURTHER
MADDOX, Justice (dissenting further) [opinion issued March 22, 1995].
On March 14, 1995, after noting that the dissenting opinion I was filing "was hurriedly prepared," because I had only four hours within which to prepare and file it, I stated that "I reserve the right to make any corrections that I might need to make in this dissenting opinion at a later date, and to write additionally should I desire." 676 So.2d at 1259.
I desire to write additionally, to address primarily the special concurring opinion of Justice Cook, filed on March 15, 1995, in which he specifically stated that "[he] deem[ed] it necessary to write specially in order to address an issue raised in the dissent, namely, the question of the state court's subject-matter jurisdiction."[1] I will also address the recusal issue.

The Jurisdictional Bar
I have carefully read and considered Justice Cook's special concurring opinion, in which he states that the interpretation of Ala.Code 1975, § 17-15-6, by the Eleventh Circuit, an interpretation with which I agree, "flies in the face of well-established rules of statutory construction and the long-settled case law of this state." I must respectfully disagree with that assessment of the Eleventh Circuit's interpretation, because I find rather recent authority of this Court that I believe supports the Eleventh Circuit's interpretation.
The latest expression of the law of this State on the jurisdiction of a circuit judge to interfere with an election and any subsequent contest of an election was stated in the so-called "Baxley-Graddick" primary election contest for Governor of Alabama in 1986, when Circuit Judge Jack Carl, at the request of Charles Graddick and others, issued an injunction against the State Democratic Executive Committee, enjoining it from entertaining a contest of the Democratic primary run-off for Governor of Alabama in 1986.
In the Baxley-Graddick contest in 1986, the opposing parties essentially did what the opposing parties did in this case. One candidate, Charles Graddick, sought a State court injunction to enjoin with the tribunal that was entertaining a contest of the election from further proceedings; the other candidate, William Baxley, and parties on his behalf, filed a contest, as allowed by State law. Others who supported Baxley went into a federal court, alleging primarily violations of the Voter Rights Act,[2] just as Larry Roe and others have done in this case.
The Baxley-Graddick contest involved a Democratic primary election, where the party executive committee was the tribunal, under provisions of State law, vested with the power to declare the ultimate winner of the run-off election.[3] In that run-off primary election, Charles Graddick had received the most votes, but William Baxley and two electors filed contests. As authorized by State statutes, the chairman of the State Democratic Executive Committee appointed a subcommittee to hear and determine the *1261 contest. Graddick filed a motion with the committee to dismiss the contest, and later filed, before Judge Jack Carl, a petition for a temporary restraining order, writ of prohibition, and other extraordinary and equitable relief, to halt the election contest proceedings and all discovery by Baxley. Judge Carl, as Judge Eugene Reese of the Montgomery Circuit Court did in the subject case on petition of the so-called Davis class, granted Graddick his requested relief. Baxley appealed to this Court, asking that this Court vacate Judge Carl's order.[4] This Court did. Ex parte Baxley, 496 So.2d 688 (Ala.1986). What did this Court, in that case, say about the jurisdiction of a circuit court, in view of the plain language of Ala.Code 1975, § 17-15-6? It said exactly what the Eleventh Circuit said in this case, and what I said in my original dissent on the jurisdictional question, that "the trial court [in enjoining the contest was] without authority and in express violation of statutory and case law. Code 1975, § 17-15-6; State v. Albritton, 251 Ala. 422, 37 So.2d 640 (1948); Ex parte State ex rel. Tucker, 236 Ala. 284, 181 So. 761 (1938)." Ex parte Baxley, 496 So.2d 688, 691 (Ala.1986). (Emphasis added.)
This Court vacated the injunction issued by Judge Carl and allowed the State Democratic Executive Committee to conduct the contest, which declared Baxley the winner of the run-off election. Joining in the opinion in Ex parte Baxley were Jones, Almon, Shores, Adams and Steagall, JJ.; Torbert, C.J., concurred specially with an opinion, in which Houston, J., concurred; Maddox, J., concurred specially; Beatty, J., did not sit.
The four Justices who concurred in the opinion in this case state that "[h]ad the Republican Party appealed from the order of the Circuit Court of Montgomery County issued in November, 1994, the entire controversy involving the November general election would have been resolved long ago," and that "[t]he people of Alabama would have known the outcome of the election, and the losing candidates, had they chosen to do so, could have contested the elections in the state legislature." This statement by the four Justices suggests that they would have affirmed the judgment of Judge Reese and not followed the law set out in Ex parte Baxleyi.e., would not have held that Judge Reese, like Judge Carl, was "without authority and in express violation of statutory and case law. Code 1975, § 17-15-6 ..." (Emphasis added.)
Based on the foregoing, and as I stated in my original dissent, to which Justice Cook's special concurrence is primarily addressed, I agree completely with the Eleventh Circuit's interpretation of Ala.Code 1975, § 17-15-6,[5] and I would apply the provisions of that law to Judge Reese with the same force that I voted to apply it against Judge Carl.[6]
The provisions of Ala.Code 1975, § 17-15-6, creating a jurisdictional bar, are clear. Furthermore, the Legislature of Alabama, in Ala.Code 1975, §§ 17-15-50 through 17-15-63, has "specially and specifically enumerated and set down by statute" that "[t]he two houses of the legislature, in joint convention assembled, and presided over by the speaker of the house of representatives, shall constitute the tribunal for the trial of all contests for the office of ... justices of the supreme court...."
*1262 In view of the fact that the Legislature, by statute, has "specially and specifically enumerated" how contests of the election of chief justice and treasurer are to be tried, just as the Legislature provided for the tribunal to hear primary election contests in Ex parte Baxley, why does Judge Reese have jurisdiction when Judge Carl so clearly did not?
The law has not changed; a circuit court, under the facts of this case, has no more jurisdiction than Judge Jack Carl had in Ex parte Baxley, to enjoin the determination of the winner of the November 8, 1994, election. If after the votes are certified, the losing candidate feels that there are grounds for a contest of those results because illegal votes were cast, that party can file a contest with the "two houses of the Legislature," which the Legislature has specially and specifically enumerated as the "tribunal" to try the contests of races involving justices of the Supreme Court, and the state treasurer. Consequently, the law, as interpreted and expressed in Ex parte Baxley, specifically says that the Circuit Court of Montgomery County was devoid of any jurisdiction, just as the Eleventh Circuit recognized, and as I state in my original dissent.
Justice Cook cites three Alabama cases that he believes are clear authority for the legal position he takes, and I will discuss those briefly: Ex parte Pollard, 251 Ala. 309, 37 So.2d 178 (1948) (contest of Democratic nomination for county board of revenue); Hudmon v. Slaughter, 70 Ala. 546 (1881) (office of alderman for the City of Opelika); and Sears v. Carson, 551 So.2d 1054 (Ala. 1989) (involved an election for the office of Franklin, Alabama, town council). I think that each of those cases is clearly distinguishable. None of those cases involved a factual setting where a circuit court, before election results were certified, issued an injunction and directed the certifying official to certify certain votes as legal votes. On the other hand, each of those cases involved an election contest, not a pre-certification contest. Each of those cases involved a factual setting where the tribunal conducting the contest had determined a winner and the official having the responsibility of certifying the tribunal's determination of the winner refused to certify the candidate who had been declared by the tribunal deciding the contest to be the winner. Here, the facts are far different. Here, the circuit court interrupted the process before the results of the election were certified, and before any contest was filed in the Legislature. In Ex parte Baxley, the actions were filed after the results of the election were certified, not before, but the facts are similar to this case in that one candidate was trying to prevent the tribunal established by the Legislature from hearing the contest.
In Ex parte Baxley, this Court, with eight members agreeing, said that Judge Carl was "without authority and in express violation of statutory and case law. Code 1975, § 17-15-6; State v. Albritton, 251 Ala. 422, 37 So.2d 640 (1948); Ex parte State ex rel. Tucker, 236 Ala. 284, 181 So. 761 (1938)." (Emphasis added). 496 So.2d at 691. That case answers the jurisdictional argument.

The Recusal Motion
I did not address in my original dissent the recusal motions that were filed in this case, and several things have occurred since they were filed. From the very start, I was concerned about present members of this Court sitting in a case that involved a question of who would be serving as Chief Justice of this Court for six years.
Although I do not believe that I am legally disqualified,[7] it is my opinion that the members of this Court should have done as members of the Court have done previously, when another member of the Court was intimately connected with the case before the Court recuse and permit the appropriate appointing authority to select a special court. The selection of a Special Supreme Court in such cases changed somewhat with the adoption of Amendment 328 to the Constitution, the Judicial Article.
Before the adoption of Amendment 328, the members of this Court had, on several *1263 occasions, recused when a case or controversy pending before the Court involved one of its members. See Ex parte Alabama Power Co., 280 Ala. 586, 196 So.2d 702 (1967); State Docks Commission v. State ex rel. Jones, 227 Ala. 521, 150 So. 537 (1933); Abramson v. Hard, 229 Ala. 2, 155 So. 590 (1934); Cook v. Continental Insurance Co., 220 Ala. 162, 124 So. 239 (1928); Riley v. Bradley, 252 Ala. 282, 41 So.2d 641 (1948); see, also Johnston v. Alabama Public Service Commission, 287 Ala. 417, 422, 252 So.2d 75 (1971) (the court was divided 4-4 and a lawyer was appointed as a special Justice by the Governor under the predecessor to Ala.Code 1975, § 12-2-14). Since the adoption of the Judicial Article, there have been three occasions when the full Court recused, and the Chief Justice or the senior Associate Justice appointed a special court. See, Parsons Steel, Inc. v. Beasley, 600 So.2d 248 (Ala.1992); Pippin v. Brassell, 455 So.2d 816 (Ala.1984); Duncan v. Johnson, 338 So.2d 1243 (Ala.1976).
Before the adoption of the Judicial Article, special Supreme Courts were appointed by the Governor pursuant to the provisions of Tit. 13, § 15, Code of Alabama 1940 (now § 12-2-14, as amended by Act No. 602, Ala. Acts 1969). See, Ex parte Alabama Power Co., 280 Ala. 586, 196 So.2d 702 (1967).
After the adoption of the Judicial Article, in Duncan v. Johnson, Pippin v. Brassell, and Parsons Steel, Inc. v. Beasley, the sitting Chief Justice, or the senior Associate Justice, based on recommendations from other members of the Court, appointed the Special Supreme Court. In none of the cases since the adoption of the Judicial Article has the authority of the Chief Justice or the senior Associate Justice to appoint a special Court been challenged or questioned, as it has been here.
There was a question in my mind from the date of the adoption of the Judicial Article whether the Governor or the Chief Justice was the appointing authority for a Special Supreme Court. The issue first came up in Duncan v. Johnson, and the Chief Justice assumed the authority to appoint. In Duncan, no challenge was raised about his authority to do so. If a challenge had been made, I seriously question whether the Chief Justice, or a senior Associate Justice, had that authority, in view of the statutory scheme set out in Ala.Code 1975, § 12-2-14 and § 12-18-7. Under the provisions of § 12-2-14, the Governor can appoint any member of the Bar, or the Governor may also appoint retired judges under the provisions of § 12-18-7, which provides, in part, that "[t]he retiring justice or judge, upon being retired, shall take the oath of office as a retired justice or judge and thereupon become an extra or additional judge of the state," and "[t]hereafter, on the request of the chief justice, the presiding judge of one of the courts of appeals or the governor, any such retired justice or judge may serve on the supreme court, on either of the courts of appeals or on any circuit court in the state," and "[s]uch retired justice or judge, when serving on a court in the absence or disqualification of the regular justice or judge, as the case may be, shall have and exercise all the duties and functions of the regular justice or judge for whom he is substituting." (Emphasis added.)
Before the adoption of the Judicial Article, the law provided that the Governor was vested with the authority to appoint special Justices and special circuit judges. After the adoption of the Judicial Article, I am personally of the opinion that if a special Supreme Court is needed as provided in § 12-2-14, the law says that the Governor at the time the Special Supreme Court is needed would be the one authorized to make the appointments.[8]

ON APPLICATION FOR REHEARING

[Issued March 31, 1995]
PER CURIAM.
APPLICATION STRICKEN. NO OPINION. See Burnham Shoes, Inc. v. West American Insurance Co., 504 So.2d 238, 242 (Ala.1987).
*1264 ALMON, SHORES, INGRAM, and COOK, JJ., concur.
MADDOX, J., dissents, with opinion.
MADDOX, Justice (dissenting) [opinion issued March 31, 1995].
On March 24, 1995, Jeff Sessions, as Attorney General of Alabama, filed an application for rehearing, styled "APPLICATION FOR REHEARING AND BRIEF OF THE STATE OF ALABAMA, SECRETARY OF STATE, PROBATE JUDGES, SHERIFFS, AND CIRCUIT CLERKS," in which the Attorney General asks this Court to grant a rehearing and enter the following orders:
"(1) the certification of the necessity for the appointment of a special court, under section 12-2-14 of the Code of Alabama, from Associate Justice Maddox to Governor James;
"(2) an order withdrawing and vacating the answer to the certified question entered on March 14, 1995;
"(3) an order notifying the United States Court of Appeals for the Eleventh Circuit of the withdrawal of the Answer; and
"(4) the issuance of an answer to the certified question that follows the plain language of section 17-10-7 of the Code of Alabama."
My colleagues who concur to strike the application for rehearing, rely upon this Court's case of Burnham Shoes, Inc. v. West American Insurance Company, 504 So.2d 238, 242 (Ala.1987). Although this Court in that case declined, by a five to four vote, to entertain an application for rehearing in a certified question proceeding, that certified question involved an insurance claim, and there was a dissent filed in that case by Justice Jones, in which I, and two other Justices, joined, where Justice Jones said:
"Implicit in the Court's order `striking' (as opposed to `overruling') the insurer's application for rehearing is the holding that applications for rehearing are not authorized in certified question cases. Because the case came to this Court from the federal court by the certified question route, this Court reasons that it lost jurisdiction upon submission of its answer to the inquiring court, and that only that court can seek reconsideration or clarification.
"Respectfully, I disagree with this analysis of this Court's role in this kind of case. It is the office of an application for rehearing to afford the nonprevailing party an opportunity to seek reconsideration by the reviewing court, and to afford the reviewing court one final opportunity to correct any errors in its opinion.
"The federal court, in diversity cases, is interested only in being informed on state law issues, not in having certified questions answered in a particular manner. Only the parties have an interest in how the question is answered. Thus, it is only the parties and their counsel that have an interest in seeking rehearing, and not the court. Then, too, I find no wisdom in this Court's shielding itself from reconsideration of its own opinion. After all, the application for rehearing affords this Court its final opportunity to get it right.
"I find nothing in the certified question procedure that requires us to deviate from our traditional procedure in regard to applications for rehearing. I would accept the application and consider it on its merits."
504 So.2d at 242.
I believe that Justice Jones' views in that dissent are sound, and should be applied here.
Furthermore, the Application for Rehearing, even though filed by the Attorney General of Alabama, purports to be filed on behalf of the State of Alabama, the Secretary of State, and several other State officials.[1] The Application for Rehearing raises several legal issues that were either not addressed or *1265 were not sufficiently and correctly addressed on the original submission of this case. That is especially true of the serious question involving the jurisdiction of the circuit court to issue an injunction in Odom v. Bennett, the action that spawned all of the other proceedings, including this one. Also, the Application for Rehearing raises a question of the jurisdiction of this Court in view of the fact that only five Justices participated in the original decision, in light of the provisions of § 12-2-14 of the Code of Alabama. The Attorney General argues, in brief, that the jurisdiction of a court can be questioned at any time, Manning v. Wingo, 577 So.2d 865 (Ala.1991); City of Birmingham v. Reed, 35 Ala.App. 31, 44 So.2d 607, 611 (1949).
In my original dissenting opinion and supplemental dissent I addressed several of the issues raised in the application for rehearing, and my views on the law have not changed. I would grant the application for rehearing.
NOTES
[1] To comport with the undisputed facts, the certified question has been recast pursuant to common practice. 17A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, Jurisdiction 2d § 4248 p. 178 (1988); Barnes v. Atlantic & Pacific Life Ins. Co. of America 530 F.2d 98 (5th Cir.1976).
[2] Probate judges, sheriffs, circuit clerks, and custodians of voting machines in all counties in the State of Alabama.
[3] Odom v. Bennett, No. CV-94-2434-R, Circuit Court, Montgomery County.
[4] The affidavit of Jasper Fielding, Probate Judge of Coosa County, Alabama, states that John W. Davis's ballot had only one witness, and that his ballot was not counted.
[5] The defendants named in the suit were Secretary of State Bennett and three Montgomery County officials, Probate Judge Walker Hobbie, Jr., Circuit Clerk Debbie Hackett, and Sheriff Dan Jones, in their official capacities.
[6] When the case was filed, it was assigned to Judge Reese by the automated assignment system maintained by the Clerk's office when it was filed. Because Judge Reese had left the courthouse on November 16 before the complaint was filed at 5:23, the TRO complaint was presented to Judge Phelps.
[7] The defendants were named as representatives of those persons who are designated by Alabama state law as the Appointing Boards in each of Alabama's counties and those persons who are designated by law to maintain the possession and security of all materials relating to the November 8, 1994, election.
[8] Bradford v. State of Alabama, et al., CV-94-PT-2816-M (N.D.Ala.), November 25, 1994.
[9] Judge Propst, the judge to whom all single-judge matters were assigned in Bradford, is widely respected for the depth of his legal scholarship.
[10] The defendants objected to the consideration of the new claims.
[11] The abstention doctrine has been explained as follows:

"Thus was born what has come to be known as Pullman-type abstention. If there are unsettled questions of state law in a case that may make it unnecessary to decide a federal constitutional question, the federal court should abstain until the state court has resolved the state questions. This leads to an authoritative answer, rather than merely a forecast on the state questions, and, depending on how the state questions are answered, may make it unnecessary to decide the federal constitutional question."
17A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure, Jurisdiction 2d § 4241, p. 8 (1988). Thus, a federal court "may, and ordinarily should, refrain from deciding a case in which state action is challenged in federal court as contrary to the federal constitution if there are unsettled questions of state law that may be dispositive of the case and avoid the need for deciding the constitutional question." Id. at § 4242, p. 30.
The Eleventh Circuit, while recognizing the abstention doctrine, has dismissed it and concluded that to leave the plaintiffs to their state remedies is neither workable nor appropriate in this case. Why not? This statement is particularly surprising in view of the fact that the Eleventh Circuit sanctioned Alabama's election contest statutes, § 17-15-1 et seq., as providing an adequate procedure for addressing election irregularities. Curry v. Baker, 802 F.2d 1302, 1317 (11th Cir.1986).
[12] Alabama has a Unified Judicial System. § 6.01, Art. 6, Amendment 328, Alabama Const. This Court has general supervision and control over all of the inferior courts in the state. § 6.02, Art. 6, Amendment 328, Ala. Const. 1901. The Montgomery County Courthouse is located only a block from the Judicial Building in which this Court sits. In the Montgomery County Courthouse, there is a case ripe for adjudication. A direct appeal from a judgment in that case lies to this Court. A record has been developed in that case, and a motion for summary judgment has been filed. The record contains undisputed evidence that is material to this Court's ability to answer the question certified. We have directed the clerk of the Montgomery County Circuit Court to certify the record in Odom v. Bennett, CV-94-2434, to this Court to aid us in answering the question certified.
[13] In Covington County, 11 absentee ballots that lack a notary or two witnesses were counted; in Marion County, all 577 absentee ballots were counted, without examination. Former Secretary of State Billy Joe Camp, who trained poll workers and has had personal knowledge of absentee voting procedures for 25 years, stated that the general practice has been for absentee ballots to be counted if there was substantial compliance. Fred Posey, circuit clerk of Autauga County for 50 years, stated that it was his practice, as absentee ballot manager, to accept signed absentee ballots although the affidavit did not contain a notary or witness, unless he thought there was fraud involved. In Winston County, 81 absentee ballots were included in the county's official tally, although it was discovered that the ballots were notarized by someone whose commission had expired.
[14] In Sumter County, past election officials had used a substantial compliance test, but in the November 8 election, they switched to a strict compliance test. Based on her experience with past elections, the circuit clerk of Sumter County estimated that approximately 1,000 absentee ballots were cast. In Bullock County, 21 signed absentee ballots were rejected because of missing witness signatures.
[15] The candidates also claimed they were defeated because legal votes were rejected, while others were miscalculated, and because of misconduct by some election officers.
[16] Justices Maddox and Adams dissented from this holding, saying that, in their opinion, convicted felons should be permitted to vote until their names are formally removed from the list of qualified voters.
[17] According to Ala.Code 1975, § 17-4-127, a person whose name does not appear on the voting list shall not be allowed to vote unless the person: (i) votes a challenged ballot or (ii) presents a certificate from the board of registars. See Williams, 628 So.2d at 534.
[18] See Appendix A for majority jurisdictional survey.
[19] See Appendix B for minority jurisdictional survey.
[20] The fact that Justice Houston believes that because he also contributed $500 to Chief Justice Hornsby it disqualifies him to sit, does not compel the same belief by any other Justice.
[1] After quoting at length § 17-15-6, see 43 F.3d at 577 n. 4, the Court of Appeals stated that the Montgomery County Circuit Court judge "determined that [he] had the authority to enter the injunction despite the jurisdictional bar of § 17-15-6." 43 F.3d at 579 n. 6.
[2] See § 17-15-1 (prescribing grounds for contests).
[3] See, e.g., § 17-15-20 (concerns the sufficiency of the statement initiating contests for, among others, the offices of "senator, representative in the Legislature, judge of the circuit court or district court"); § 17-15-29 (concerns the sufficiency of the statement initiating contests for the offices of "judge of probate court and other county and municipal officers"); § 17-15-51 (concerns the sufficiency of the statement initiating contests for "state officers").
[4] See, e.g., § 17-15-3 (qualifications of witnesses in contest actions); § 17-15-4 (access of parties in a contest action to "registration and poll lists"); § 17-15-21 (notice to parties in contest actions); §§ 17-15-24 to -26 (depositions in contest actions); § 17-15-29 (requisites for contesting elections of "county and municipal officers"); § 17-15-31 (examination of ballots by judges in election contests); § 17-15-53 (joint legislative commission elected to receive testimony in election contests); §§ 17-15-55 to -57 (joint legislative commission empowered to procure evidence and testimony); § 17-15-60 (joint legislative "[c]ommission to report conclusions and evidence").
[5] Tit. 17, § 366, provided in pertinent part:

"The county executive committee of the party or parties participating in said primary election shall meet at the courthouse of their counties, not later than Wednesday, noon, next following said primary election, and receive said returns, canvass and tabulate the same, by precincts, and publicly declare the results thereof; and the chairman of each county executive committee shall forthwith, and not later than the next day, certify and return to the chairman of the state executive committee a statement and tabulation, by precincts, of the result of said primary election and of the number of votes received by each candidate therein for office, except candidates for county office, and not later than noon on the Tuesday next following said primary election, the state executive committee, or such sub-committee thereof as may have been appointed by the chairman thereof for such purpose shall meet at the State Capitol in Montgomery and receive said returns and canvass and tabulate the same by counties, and publicly declare the result thereof as to all candidates for office therein, except candidates for county office...."
(Emphasis added.)
[6] Ala.Code 1975, § 11-46-55(a), provides:

"(a) Not later than 12:00 noon on Wednesday after the election as required in this article the municipal governing body shall proceed to open the envelopes addressed to such governing body which have been delivered by the several returning officers to the municipal clerk, canvass the returns and ascertain and determine the number of votes received by each candidate and for and against each proposition submitted at such election. If it appears that any candidate or any proposition in such election has received a majority of the votes cast for that office or on that question, the municipal governing body shall declare said candidate elected to such office or said question carried, and a certificate of election shall be given to such persons by the municipal governing body or a majority of them, which shall entitle the persons so certified to the possession of their respective offices immediately upon the expiration of the terms of their predecessors as provided by law."
(Emphasis added.)
[1] The Eleventh Circuit Court of Appeals wrote an opinion in the case, and I attach a copy of that opinion, including the dissenting opinion, without the Appendix to that opinion, as Appendix A to this dissent. [Note from the Reporter of Decisions: Justice Maddox did not attach a copy of that opinion, but that opinion is published at 43 F.3d 574.]
[2] This determination by the Eleventh Circuit Court of Appeals that Wells v. Ellis and Williams v. Lide are not controlling precedent on the issue before that Court, is consistent with a conclusion reached by another Federal judge, United States District Judge Robert Propst in Ralph E. Bradford, Sr., et al. v. The State of Alabama, et al., (CV 94-PT-2816-M, United States District Court for the Northern District of Alabama, Middle Division, November 25, 1994), wherein he wrote:

"On November 18, 1994, this judge preliminarily concluded that the order of the Circuit Court of Montgomery County, Alabama [in Odom v. Bennett] clearly brought about and will bring about changes to voting standards, practices or procedures. With regard to absentee ballot affidavits, § 17-10-7, provides Your signature must be witnessed by either: A notary public or other officer authorized to acknowledge oaths or two witnesses 18 years of age or older.' (emphasis added). [Footnote 2] It is not clear who represented the voters of Alabama in said case. Of course, the same question might be asked concerning this case, [end of Footnote 2]. This court respectfully disagrees with a conclusion that an `affidavit' which does not include either of the prescribed attestations `substantially complies' with the statute. Further, this judge does not agree that Williams v. Lide, 628 So.2d 531 (Ala.1993) so holds. Further, there was no evidence that Williams v. Lide itself had been precleared prior to November 8, 1994."
[3] In Wells v. Ellis, this Court set out the "substantial compliance" test, as follows:

"In 1984, the Florida Supreme Court, again faced with an election dispute, reaffirmed the Boardman decision and summarized the "Boardman factors" to be considered in determining whether an election should be set aside:
"`(a) the presence or absence of fraud, gross negligence, or intentional wrongdoing;
"`(b) whether there has been substantial compliance with the essential requirements of the absentee voting law; and
"`(c) whether the irregularities complained of adversely affect the sanctity of the ballot and the integrity of the election.'"
[4] The absentee ballots involved in that election dispute were not before this Court.
[5] Id., 551 So.2d at 384.
[6] There is a collection of cases on absentee voting laws in Annot., Construction of Absentee Voters' Laws, 97 A.L.R.2d 257.
[7] Ala.Code 1975, § 17-10-19, which was repealed by the new Criminal Code, Acts of Alabama 1977, Act No. 607, and was effective January 1, 1980, provided:

"Any absentee voter who shall willfully make or subscribe to an oath falsely in order to qualify himself to vote at a primary or general election as an absentee voter shall be guilty of perjury."
This section was replaced by § 4907 of Act No. 607, now codified at Ala.Code 1975, § 13A-10-103 ("Perjury in the third degree"). Section 13A-10-103 provides:
"(1) A person commits the crime of perjury in the third degree when he swears falsely.
"(2) Perjury in the third degree is a Class B misdemeanor."
"[S]wears falsely" is defined in § 13A-10-100(b)(1) as "[t]he making of a false statement under oath required or authorized by law."
[8] It would seem to be unquestioned that the Legislature has the power to circumscribe the jurisdiction of a circuit court in Alabama, and I can find no legislative authority that would grant jurisdiction to a circuit court, based on the facts as presented in this case, to enjoin election officials from certifying the results of an election for state officers.

Amendment 328, § 6.04, provides:
"(a) The state shall be divided into judicial circuits. For each circuit, there shall be one circuit court having such divisions and consisting of such number of judges as shall be provided by law.
"(b) The circuit court shall exercise general jurisdiction in all cases except as may otherwise be provided by law. The circuit court may be authorized by law to review decisions of state administrative agencies and decisions of inferior courts. It shall have authority to issue such writs as may be necessary or appropriate to effectuate its powers, and shall have such other powers as may be provided by law."
[9] Justice Gorman Houston was of that opinion in this case. He dissented on the question whether to accept the certified question on jurisdictional grounds.
[10] It appears to me that the Eleventh Circuit, even though deferring to this Court to address the question of Alabama law, would not be bound by this Court's interpretation, if this Court's interpretation deprived the plaintiffs of Federal constitutional rights.
[1] In the normal case, the disagreements on the law could have been addressed in the same opinion, but this case was not formally conferenced; consequently, the "necess[ity] to write specially in order to address an issue raised in the dissent," normally would not have occurred, and clearly there would be no need for our views to be expressed separately and without discussion with our colleagues on the Court.
[2] The interplay between the federal and state courts in that case on the jurisdictional questions and the application of federal constitutional law in voting rights disputes are strikingly similar, except the parties are basically taking opposite positions. See, Ex parte Baxley, 496 So.2d 688 (Ala.1986); Henderson v. Graddick, 641 F.Supp. 1192 (M.D.Ala.1986); Curry v. Baker, 802 F.2d 1302 (11th Cir.1986). Many of the attorneys who represented parties in the Baxley-Graddick matter are now involved in this case.
[3] Here, the contest is over a statewide office and the Legislature has designated itself as the tribunal to determine such contests.
[4] There was no appeal taken in this present case, even though the Secretary of State and the Attorney General must have been aware of the provisions of law barring circuit courts from interfering with the election process.
[5] Ala.Code 1975, § 17-15-6 provides, in pertinent part:

"No jurisdiction exists in or shall be exercised by any judge, court or officer exercising chancery powers to entertain any proceeding for ascertaining the legality, conduct or results of any election, except so far as authority to do so shall be specially and specifically enumerated and set down by statute; and any injunction, process or order from any judge, court or officer in the exercise of chancery powers, whereby the results of any election are sought to be inquired into, questioned or affected, or whereby any certificate of election is sought to be inquired into or questioned, save as may be specially and specifically enumerated and set down by statute, shall be null and void and shall not be enforced by any officer or obeyed by any person...."
[6] I concurred specially in Ex parte Baxley. It appears that the jurisdiction of the SDEC to hold a hearing had been determined; therefore, the state court was without any jurisdiction.
[7] On March 17, 1995, the Judicial Inquiry Commission, answered a request for an advisory opinion by Justice Terry Butts, which suggests that there may be some serious ethical concerns presented in this case.
[8] When the Certified Question was initially filed, Jim Folsom, Jr., was Governor. On January 16, 1995, Fob James became Governor.
[1] The first paragraph of the application for rehearing states:

"The State of Alabama, Secretary of State, Probate Judges, Sheriffs, and Circuit Clerks apply to this Court, under Alabama Rule of Appellate Procedure 40, for a rehearing of this matter by a special court appointed by the Governor, after certification under section 12-2-14 of the Code of Alabama by Associate Justice Maddox, and, upon rehearing, move this Court to withdraw its original answer to the certified question (the Answer) entered on March 14, 1995." (Emphasis added).